```
 1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON
 2                       IN TACOMA

 3   -----------------------------------------------------------

 4   HP TUNERS, LLC,                )
                                    )
 5            Plaintiff,            )  No. CV17-5760BHS
                                    )
 6      v.                          )
                                    )
 7   KEVIN SYKES-BONNETT and        )
     SYKED ECU TUNING,              )
 8   INCORPORATED,                  )
                                    )
 9            Defendants.           )

10
     -----------------------------------------------------------
11
                         TRO HEARING
12
     -----------------------------------------------------------
13
                       August 29, 2018
14

15        BEFORE THE HONORABLE BENJAMIN H. SETTLE
             UNITED STATES DISTRICT COURT JUDGE
16

17   APPEARANCES:

18   For the Plaintiff:        Andrew Bleiman
                               MARKS & KLEIN
19                             Stephen Leatham
                               HEURLIN POTTER JAHN LEATHAM
20                             HOLTMAN & STOKER

21   For the Defendants:       John Whitaker
                               Tyler Kendrick
22                             LANE POWELL

23

24
     Proceedings stenographically reported and transcript
25        produced with computer-aided technology
```

10:10:04AM 1          THE CLERK:  This is the matter of HP Tuners

10:10:09AM 2    versus Sykes-Bonnett, Cause No. CV17-5760BHS.  Counsel,

10:10:12AM 3    please make an appearance.

10:10:13AM 4          MR. BLEIMAN:  Good morning, your Honor.  Andrew

10:10:15AM 5    Bleiman on behalf of HP Tuners.  Along with me today is

10:10:19AM 6    Keith Prociuk of HP Tuners and Steve Leatham.

10:10:24AM 7          THE COURT:  Good morning.

10:10:25AM 8          MR. WHITAKER:  Good morning, your Honor.  John

10:10:26AM 9    Whitaker.  Beside me is Kevin Sykes-Bonnett of Syked

10:10:30AM 10   Tuning.  Beside him is Tyler Kendrick, an associate at the

10:10:35AM 11   firm Lane Powell.

10:10:36AM 12         THE COURT:  Good morning.  This matter was set

10:10:37AM 13   for hearing to take up two motions for temporary

10:10:40AM 14   restraining order, each party having filed one.  We will

10:10:48AM 15   take up first the plaintiff's motion, and then the

10:10:55AM 16   defendants' motion.  So, Mr. Bleiman, I will hear from

10:11:02AM 17   you.

10:11:03AM 18         MR. PROCIUK:  Thank you, your Honor.  Is it all

10:11:05AM 19   right if I stay at counsel table, or would you like me to

10:11:07AM 20   go to the podium?

10:11:07AM 21         THE COURT:  You can stay at counsel table,

10:11:09AM 22   because there may be some back and forth here.

10:11:13AM 23         MR. BLEIMAN:  Thank you.  Your Honor, the

10:11:15AM 24   defendants misled this court almost a year ago in

10:11:17AM 25   connection with our initial application for temporary

10:11:20AM 1    restraining order, and have engaged in a pattern and

10:11:23AM 2    practice of concealment and nondisclosure throughout the

10:11:26AM 3    course of this litigation.

10:11:27AM 4        It took an anonymous informant coming forward to

10:11:30AM 5    provide us information that the defendants should have

10:11:33AM 6    provided long ago in accordance with the Federal Rules of

10:11:38AM 7    Civil Procedure.  However, instead of complying with their

10:11:40AM 8    obligations and being forthright and compliant in their

10:11:43AM 9    disclosures in discovery, defendants made material

10:11:46AM 10   misrepresentations in connection with their answer and

10:11:49AM 11   have grossly violated the federal rules throughout the

10:11:53AM 12   course of this litigation.

10:11:54AM 13       For example, in their answer, in Paragraph 69, the

10:11:58AM 14   defendants denied an allegation that they had knowingly

10:12:02AM 15   created, generated, obtained, used, fraudulent application

10:12:07AM 16   keys that were not generated by HP Tuners.  In their

10:12:10AM 17   answer at Paragraph 73 of the complaint they denied

10:12:13AM 18   possessing the HP Tuners key generator tool.  In

10:12:18AM 19   Paragraphs 75 and 81 they denied adding extra licenses to

10:12:22AM 20   existing interfaces.  However, in connection with this

10:12:28AM 21   renewed emergency motion for TRO, we have declarations of

10:12:32AM 22   both Mr. Sykes-Bonnett and Ken Cannata where they admit

10:12:37AM 23   that defendants have the license generator tool and have

10:12:40AM 24   used it to generate licenses for third parties.

10:12:45AM 25       There is many other examples of --  Given their

10:12:50AM  1   admitted possession of HP Tuners' intellectual property in

10:12:56AM  2   these declarations --

10:12:59AM  3          THE COURT:  Now the contention is that there was

10:13:02AM  4   an authorized disclosure, correct?  That's what defense is

10:13:05AM  5   arguing?

10:13:07AM  6          MR. BLEIMAN:  Unauthorized?

10:13:09AM  7          THE COURT:  It was an authorized --

10:13:13AM  8          MR. BLEIMAN:  I don't believe that they have made

10:13:14AM  9   that argument, your Honor.  What they have said is

10:13:16AM 10   Mr. Cannata did provide it to him, but nowhere did

10:13:21AM 11   Mr. Cannata state in his declaration that he was

10:13:23AM 12   authorized to do it.  He didn't state that he did it

10:13:26AM 13   during the course of time prior to him leaving HP Tuners,

10:13:33AM 14   because the timeline doesn't add up.

10:13:35AM 15       As we have pointed out, this issue that he claims

10:13:39AM 16   existed regarding the unpaid credits or the frustration

10:13:42AM 17   that Mr. Sykes-Bonnett had regarding not having received

10:13:46AM 18   credits was still an issue in November of 2016, after the

10:13:51AM 19   date that Mr. Cannata was no longer with the company.

10:13:56AM 20       Mr. Sykes-Bonnett posted a message on Facebook

10:14:00AM 21   complaining about HP Tuners, complaining about how he was

10:14:02AM 22   owed credits.  It was November 15th, 2016, I believe.

10:14:06AM 23   Mr. Cannata was out of the company in October.  On that

10:14:09AM 24   very same day Mr. -- HP Tuners did issue those credits to

10:14:15AM 25   Mr. Sykes-Bonnett, and he posted a message then and there,

10:14:20AM 1   as well, that the debts, quote, have been settled.  The

10:14:24AM 2   timeline doesn't add up.

10:14:26AM 3        They have also admitted to those allegations in the

10:14:28AM 4   complaint, that this issue existed after Mr. Cannata was

10:14:34AM 5   no longer with the company.

10:14:36AM 6        Based on their own admissions, and the omissions, I

10:14:41AM 7   would say, from Mr. Cannata's declaration that he did this

10:14:46AM 8   before he left HPT, demonstrate this was not an authorized

10:14:52AM 9   transfer of this information.  I don't believe that is

10:14:56AM 10  even something that has been argued in their papers.  They

10:14:58AM 11  hint or suggest that maybe it was, but they don't provide

10:15:02AM 12  any particulars, certainly no evidence, to demonstrate

10:15:07AM 13  that it was an authorized disclosure of our information.

10:15:11AM 14       As far as the other types of concealment and

10:15:19AM 15  misdirection that has been involved here, your Honor, in

10:15:23AM 16  connection with the initial disclosures that the defendant

10:15:28AM 17  served in this matter, Ken Cannata is identified as a

10:15:31AM 18  person on the initial disclosures.  "Address:  Current

10:15:35AM 19  contact information unknown."  He was working with them.

10:15:38AM 20  They were communicating with him by email.  He was one of

10:15:41AM 21  their partners.  Certainly they knew exactly where he was

10:15:44AM 22  and could have provided that information.

10:15:47AM 23       They also state, "The subjects of information, may

10:15:49AM 24  have knowledge about plaintiff's products and their

10:15:53AM 25  development and any lack of any wrongful communications

10:15:56AM 1    between himself and defendants."  They were working

10:15:59AM 2    together.  These declarations now demonstrate they were

10:16:02AM 3    working together.  Mr. Cannata states in his declaration

10:16:06AM 4    he was helping Mr. Sykes-Bonnett with the development of

10:16:11AM 5    the hardware interface.

10:16:13AM 6         But nowhere is there any disclosure, identification.

10:16:20AM 7    Bobbie Cannata, one of their business partners, Ken's

10:16:23AM 8    wife, is not listed on their initial disclosures.  This

10:16:26AM 9    was intentional concealment so that we couldn't discover

10:16:29AM 10   what was really going on.

10:16:31AM 11        Now, in discovery, the same type of misdirection and

10:16:36AM 12   concealment has been taking place to date.  They have now

10:16:41AM 13   admitted they have our zip drive with all of our code,

10:16:45AM 14   they have the key generator tool, they have different HPT

10:16:49AM 15   documents and information, and that they have used it.

10:16:53AM 16        However, there has been no production of any

10:16:55AM 17   electronically-stored information or documents on those

10:16:58AM 18   issues.  We have been doing discovery for nine months.

10:17:02AM 19   They have had this stuff since before this case was ever

10:17:04AM 20   filed.  Yet, there has been no disclosure, there has been

10:17:09AM 21   no production, there has been no identification that they

10:17:11AM 22   even have any of these items.  It only took, again,

10:17:15AM 23   someone coming forward to tell us about this that we now

10:17:18AM 24   know this.  Otherwise, this concealment would still be

10:17:22AM 25   occurring.

10:17:23AM 1     Defendants had affirmative obligations to disclose

10:17:27AM 2  this type of information under Rule 26.  The federal rules

10:17:32AM 3  are designed to foster the exchange of information and

10:17:35AM 4  prevent this type of gamesmanship and concealment from

10:17:39AM 5  going on.

10:17:40AM 6         THE COURT:  Let's focus a little bit on the

10:17:41AM 7  temporary restraining order.

10:17:43AM 8         MR. BLEIMAN:  I'm sorry, your Honor.  That's

10:17:45AM 9  where I was getting to.  And that's why the TRO should be

10:17:49AM 10 granted, because it is indisputable that the defendants

10:17:51AM 11 are in possession of our confidential and proprietary

10:17:59AM 12 information from Ken Cannata, one of our former owners.

10:18:04AM 13 It includes but isn't limited to a flash drive with all of

10:18:06AM 14 our code; the key generator tool; information about our

10:18:09AM 15 MPVI interface, an admin version of our software.

10:18:14AM 16     They have access to -- take steps to unkill

10:18:20AM 17 interfaces.  They have been selling hacked interfaces.

10:18:24AM 18 There is posts from Mr. Sykes-Bonnett on Facebook where he

10:18:29AM 19 is advertising for sale an interface for $4,500 that is

10:18:35AM 20 loaded with HP Tuners credits.  It is indisputable they

10:18:40AM 21 are in possession of this USB drive, as I said.  They have

10:18:44AM 22 the key generation tool and program, which is our most

10:18:48AM 23 valuable intellectual property that the company has.

10:18:53AM 24     Essentially, what happens, your Honor --  And I think

10:18:57AM 25 there has been some discussion of the business in the

10:19:02AM 1    various papers.  But an auto enthusiast, or a shop, or a

10:19:07AM 2    person will buy credits that allow them to tune their

10:19:11AM 3    vehicle, which is a mechanism to actually connect to the

10:19:16AM 4    onboard computer of a vehicle and adjust the settings of

10:19:21AM 5    that vehicle.

10:19:23AM 6         You can, for example, make it so the car can't go

10:19:26AM 7    over 50 miles an hour.  So a fleet of trucks, some

10:19:29AM 8    business can make it so that vehicles can't go over a

10:19:32AM 9    certain speed limit.  But you can essentially adjust the

10:19:38AM 10   settings of the car's performance.

10:19:40AM 11        And then you use the credits in order to be able to

10:19:43AM 12   restart the vehicle.  Because normally when you make those

10:19:46AM 13   changes to the computer, the vehicle will not let it

10:19:49AM 14   restart.  So we sell credits that allow you to tune the

10:19:52AM 15   vehicle and then restart the car.

10:19:56AM 16        Substantially, all of our revenues are related to

10:19:59AM 17   this key generation and the purchase of credits.  They

10:20:02AM 18   have the ability to do that without paying for them.

10:20:06AM 19   That's what this key generator tool gives them.

10:20:09AM 20        They have been giving that and selling those credits

10:20:12AM 21   to third parties so they don't have to buy them from us.

10:20:16AM 22             THE COURT:  How long have they been doing this?

10:20:19AM 23             MR. BLEIMAN:  We don't know exactly.  We

10:20:21AM 24   suspected they were doing it.  There was advertisements

10:20:25AM 25   for the interfaces.  We didn't know they had the actual

10:20:28AM 1    key.  Again, this has been concealed for more than a year

10:20:32AM 2    from us.  There are anonymous people who are selling

10:20:37AM 3    credits on the internet.  We believe that to now be

10:20:42AM 4    Mr. Sykes-Bonnett.  They have the actual key, and he has

10:20:46AM 5    admitted to having it, and to using it to generate keys

10:20:49AM 6    for third parties.

10:20:50AM 7            THE COURT:  Why aren't money damages sufficient?

10:20:55AM 8            MR. BLEIMAN:  This can undermine our entire

10:20:57AM 9    business, your Honor.

10:20:57AM 10           THE COURT:  Is that what has happened?

10:21:00AM 11           MR. BLEIMAN:  It might.  We don't know yet the

10:21:03AM 12   extent of the damage.  Certainly his ability to generate

10:21:06AM 13   keys for anybody without having them -- pay us, or his

10:21:12AM 14   potential release of that key generator tool publicly or

10:21:18AM 15   to other third parties could undermine our entire business

10:21:20AM 16   and result in no one having to come to us to actually

10:21:24AM 17   purchase a credit, because they can use this tool to

10:21:27AM 18   generate the credits for free.

10:21:29AM 19           THE COURT:  Can the court, though, enter a

10:21:32AM 20   restraining order on a can, or might, or may basis?

10:21:36AM 21           MR. BLEIMAN:  In this case, given the irreparable

10:21:40AM 22   harm that we will suffer, given the balance of the

10:21:42AM 23   equities, given our likelihood of success on the merits

10:21:46AM 24   that this is proprietary information that he should not

10:21:50AM 25   possess, I believe so.

10:21:53AM 1      The harm here --  He is doing these things.  He has

10:21:57AM 2 admitted to doing these things in his declaration.  He

10:22:01AM 3 says, "I have the tool and I have used it to generate

10:22:05AM 4 licenses for third parties."  He should not be in

10:22:08AM 5 possession of the tool.  He shouldn't have the capability

10:22:11AM 6 to generate licenses for third parties.  Only we should

10:22:15AM 7 have that ability.  This is our proprietary information.

10:22:19AM 8 This is not his.  It belongs to us.

10:22:27AM 9      The value of this intellectual property cannot be

10:22:30AM 10 calculated.  We are talking potentially hundreds of

10:22:34AM 11 millions of dollars.  This is not something that doesn't

10:22:41AM 12 have any value.  This is a cornerstone of the business and

10:22:46AM 13 a piece of intellectual property that he should not have.

10:22:51AM 14      In addition, our software, our source code, the admin

10:22:55AM 15 version of the software, which he admits to possessing, is

10:22:59AM 16 not his.

10:23:01AM 17      Now, the defendants have made an issue of, "Examine

10:23:05AM 18 the source codes."  That is not determinative.  What has

10:23:09AM 19 happened here, your Honor, is that he has been able to use

10:23:11AM 20 our source code to add additional vehicles to support on

10:23:19AM 21 these offerings that he has.  So he has been able to take

10:23:23AM 22 our admin version of software, whereas he previously was

10:23:28AM 23 limited to Dodge vehicles, was Mr. Sykes-Bonnett's

10:23:33AM 24 specialty.

10:23:34AM 25      Since Mr. Cannata has been involved, and since their

10:23:37AM 1   receipt of our code, what he has been able to do is take

10:23:40AM 2   our code, see what we were doing, how we were implementing

10:23:46AM 3   algorithms into the software, and he has incorporated that

10:23:52AM 4   into his own software, which allows him to support

10:23:55AM 5   additional vehicles that he couldn't previously support.

10:23:58AM 6   So he has misappropriated our intellectual property and

10:24:04AM 7   used our source code to incorporate into the products that

10:24:08AM 8   he has had.

10:24:08AM 9       With regard to this cable, again, he had our

10:24:13AM 10  communication protocol, and has duplicated that in the

10:24:16AM 11  product that he is currently selling.  So he has taken our

10:24:19AM 12  intellectual property, the way that we communicate with --

10:24:23AM 13  the communication protocol from our MPV, and he is now

10:24:29AM 14  using that in his Syked eliminator cable.  It is a rip-off

10:24:33AM 15  of our intellectual property.

10:24:35AM 16      The reason why he is out there able to sell these

10:24:38AM 17  products for less than we are selling, and compete with

10:24:41AM 18  us, and do so without the ten-plus years of development

10:24:45AM 19  that we have taken is because he doesn't have any

10:24:47AM 20  development costs.  He has taken our stuff and used it for

10:24:51AM 21  his own.  So he is unfairly competing with us on that

10:24:59AM 22  basis.

10:24:59AM 23      As to the temporary restraining order, as I have

10:25:04AM 24  said, this isn't just about the software.  He has the key

10:25:08AM 25  generator.  He has the flash drive with all of our

10:25:15AM 1    information on it.  He has released, we believe, cracked

10:25:18AM 2    versions of our software based on his possession of the

10:25:21AM 3    admin version of our software.  So by virtue of his

10:25:27AM 4    possession of the admin version, he is able to crack our

10:25:31AM 5    software to make it so people can tune their vehicles

10:25:35AM 6    without logging into the internet and purchasing the

10:25:39AM 7    credits from us.

10:25:40AM 8         THE COURT:  If the court grants the temporary

10:25:42AM 9    restraining order, what is your response to the

10:25:45AM 10   defendant's contention that it would put him out of

10:25:48AM 11   business?

10:25:50AM 12        MR. BLEIMAN:  We disagree.  First of all, the

10:25:54AM 13   temporary restraining order would be in place until such

10:25:58AM 14   time we can have a hearing on the preliminary injunction,

10:26:01AM 15   which we would set today.

10:26:02AM 16        THE COURT:  When might that be?

10:26:04AM 17        MR. BLEIMAN:  As soon as practical.  There is

10:26:06AM 18   discovery -- some limited expedited discovery that we

10:26:10AM 19   would need.

10:26:10AM 20        THE COURT:  Roughly, what are we talking about?

10:26:12AM 21   How much time for discovery before we can have --

10:26:16AM 22        MR. BLEIMAN:  We believe in six to eight, ten

10:26:19AM 23   weeks this should be set for a hearing on the preliminary

10:26:22AM 24   injunction.

10:26:23AM 25        THE COURT:  An evidentiary hearing taking

10:26:29AM 1    testimony?

10:26:31AM 2            MR. BLEIMAN:  Correct.  We know he has cloned

10:26:33AM 3    interfaces of ours using our software, and he is selling

10:26:37AM 4    it.  He has posted on Facebook solicitations for the

10:26:46AM 5    purchase and sale of hacked interfaces of ours.

10:26:50AM 6        Now, with regard to your question about, does this

10:26:54AM 7    put him out of business?  Again, it does limit things that

10:27:00AM 8    he can do here between now and the time of the preliminary

10:27:03AM 9    injunction.

10:27:04AM 10       But there are other components to the temporary

10:27:08AM 11   restraining order, as well, relating to our information,

10:27:13AM 12   return of information, having some of the intellectual

10:27:18AM 13   property, like the cable, tendered for forensic

10:27:22AM 14   examination.

10:27:23AM 15       There are other components to the temporary

10:27:25AM 16   restraining order, as well, that are equally as important

10:27:34AM 17   beyond him not selling his cable for that period of time.

10:27:39AM 18   I think there are a number of components to the

10:27:42AM 19   restraining order that we are asking for that would also

10:27:46AM 20   be properly entered and not impact his business at all.

10:27:50AM 21           THE COURT:  If a bond is required by the court,

10:27:53AM 22   what should it be?

10:27:55AM 23           MR. BLEIMAN:  We don't believe a bond should be

10:27:59AM 24   necessary here, given the wholesale misconduct,

10:28:04AM 25   concealment, and nondisclosure that the defendants have

10:28:07AM 1  engaged in.  Again, I don't believe they have sold very

10:28:14AM 2  many units, to begin with, in their -- since they have

10:28:19AM 3  launched these products.  So I would say a very small

10:28:23AM 4  bond, because they really haven't sold many of their own

10:28:29AM 5  products anyway that would require that significant of a

10:28:41AM 6  bond.

10:28:41AM 7          THE COURT:  You will have a chance to come back.

10:28:44AM 8  I want to hear from Mr. Whitaker.

10:28:50AM 9          MR. WHITAKER:  Just for scheduling, your Honor,

10:28:52AM 10 do you want me to respond to that and then discuss our

10:28:54AM 11 TRO, which will take --

10:28:55AM 12         THE COURT:  We will take up this first and then

10:28:57AM 13 your TRO.

10:28:59AM 14         MR. WHITAKER:  Candidly, this is really about

10:29:01AM 15 trying to stifle legitimate competition.  That's the real

10:29:05AM 16 issue.  There is no question --  There are several

10:29:07AM 17 different claims, or at least wrongful actions, that are

10:29:10AM 18 alleged against Mr. Sykes.

10:29:12AM 19     Mr. Bleiman said at the first TRO there were a lot of

10:29:16AM 20 allegations -- promises made that Mr. Sykes didn't do

10:29:19AM 21 whatever he was alleged to be doing.  That's true.  That's

10:29:23AM 22 because this key generator was not a part of the first

10:29:26AM 23 TRO.  The only thing they asked for was to stop his entire

10:29:30AM 24 business, because the allegations then were, as they still

10:29:32AM 25 are --

10:29:33AM 1          THE COURT:  Let's talk about the key generator

10:29:35AM 2    alone for a moment.

10:29:36AM 3          MR. WHITAKER:  Certainly, your Honor.  The key

10:29:38AM 4    generator was provided to Mr. Sykes-Bonnett, it is true.

10:29:42AM 5    Ken Cannata was then an owner.  He had information --  He

10:29:47AM 6    and Kevin Sykes-Bonnett, as we have mentioned in the

10:29:50AM 7    moving papers, worked together, because HP Tuners was

10:29:54AM 8    seeking to acquire from him, Kevin Sykes-Bonnett,

10:29:59AM 9    directly, a lot of information about certain vehicles,

10:30:02AM 10   Dodge vehicles, because HP Tuners wanted to acquire

10:30:06AM 11   information about Dodge vehicles.  Also Ford vehicles.

10:30:10AM 12   The moving papers are pretty clear that HP Tuners was

10:30:13AM 13   seeking Mr. Sykes-Bonnett out to acquire confidential

10:30:19AM 14   information from him that they could then incorporate into

10:30:22AM 15   their product.  It is ironic they are now accusing him of

10:30:27AM 16   taking their stuff.

10:30:28AM 17         THE COURT:  Well, are you indicating this was an

10:30:30AM 18   authorized --

10:30:31AM 19         MR. WHITAKER:  Yes.

10:30:32AM 20         THE COURT:  -- transfer of this key generator?

10:30:35AM 21         MR. WHITAKER:  That is my understanding of the

10:30:37AM 22   current --  Yes.  Mr. Cannata --

10:30:41AM 23         THE COURT:  Where in Mr. Cannata's declaration

10:30:44AM 24   does it indicate this was permitted by HP Tuners?

10:30:47AM 25         MR. WHITAKER:  In the declaration he states that

10:30:49AM 1    he gave it to him to appease him for --  That he was

10:30:53AM 2    authorized by HP Tuners, your Honor?

10:30:55AM 3              THE COURT:  Yes.

10:30:56AM 4              MR. WHITAKER:  As a co-owner, I would just -- I

10:30:58AM 5    guess the implication is that as a co-owner he owns the

10:31:01AM 6    rights on equal footing as the others, and so he would do

10:31:04AM 7    with it what he will, with the understanding that was sort

10:31:07AM 8    of the common practice, this sharing confidential

10:31:10AM 9    information.

10:31:10AM 10             THE COURT:  You are saying the record

10:31:12AM 11   demonstrates implied authority?

10:31:13AM 12             MR. WHITAKER:  Yes, your Honor.  Certainly

10:31:15AM 13   implied authority, if nothing else, with the understanding

10:31:21AM 14   that it would not be used outside of the limited use for

10:31:25AM 15   which these people were exchanging confidential

10:31:29AM 16   information.

10:31:30AM 17             THE COURT:  And has it been?

10:31:32AM 18             MR. WHITAKER:  I believe Mr. Kevin Sykes-Bonnett

10:31:37AM 19   would, under oath, have to testify he used it outside the

10:31:40AM 20   purview that Mr. Cannata gave it to him.

10:31:44AM 21             THE COURT:  Why shouldn't it be returned?

10:31:46AM 22             MR. WHITAKER:  It should be, your Honor.  We have

10:31:47AM 23   no objection.  The key generator, however, is one

10:31:49AM 24   allegation of wrongdoing.  Here is a thing that HP Tuners

10:31:53AM 25   has that is worth some money.  I would like to discuss

10:31:54AM 1    irreparable harm, but it is worth some money.

10:31:57AM 2    Mr. Sykes-Bonnett should not have it.  That is undeniable.

10:32:01AM 3    He is perfectly willing to -- I don't know about return

10:32:04AM 4    it, but destroy it, cease to use it, make no further use.

10:32:06AM 5    He has made no use of it in quite some time.  It was a

10:32:10AM 6    very brief window of time.

10:32:11AM 7         As to the allegations --

10:32:13AM 8              THE COURT:  What about the flash drive?

10:32:15AM 9              MR. WHITAKER:  It is part and parcel.  It is

10:32:19AM 10   software that is stored on the flash drive.  It is a

10:32:21AM 11   little unclear to me whether the flash drive can be

10:32:24AM 12   returned.  Certainly willing to never use it again, if it

10:32:29AM 13   is even usable.  That's a little up in the air at the

10:32:33AM 14   moment.  But certainly something we need to dig into.

10:32:36AM 15             THE COURT:  You don't know whether the flash

10:32:38AM 16   drive exists?

10:32:39AM 17             MR. WHITAKER:  Currently I do not, your Honor.

10:32:41AM 18             THE COURT:  Or whether its contents have been

10:32:43AM 19   transferred to another computer?

10:32:44AM 20             MR. WHITAKER:  I am of the understanding that the

10:32:48AM 21   contents do not exist anywhere except on that flash drive.

10:32:52AM 22   If that flash drive continues to exist is the only --

10:32:57AM 23             THE COURT:  You're conceding that HP is entitled

10:33:02AM 24   to an order directing that Sykes-Bonnett cease using the

10:33:10AM 25   key generator tool, and return it if it exists in any

10:33:16AM 1    form, and similarly with respect to the flash drive?

10:33:21AM 2              MR. WHITAKER:  Yes, your Honor.

10:33:22AM 3              THE COURT:  Let's go to the software.

10:33:25AM 4              MR. WHITAKER:  And that's a critical distinction,

10:33:27AM 5    your Honor.  It is true HP Tuners sells a product, and

10:33:31AM 6    they make money, a lot of money, and have for many, many

10:33:33AM 7    years by selling these key generators.  As we discussed

10:33:37AM 8    last time, that is a completely separate issue from

10:33:40AM 9    whether Syked Tuning software includes anything from HP

10:33:44AM 10   Tuners.

10:33:44AM 11       It is, A, completely separate, and demonstrably

10:33:47AM 12   untrue, because Syked Tuning's software has been in

10:33:52AM 13   existence for years, several years before these

10:33:54AM 14   allegations came up.

10:33:55AM 15       And, critically -- why it is so critically important

10:33:58AM 16   here is, for ten months, since the last time we were all

10:34:01AM 17   here, there has been a standing offer to take Syked Tuning

10:34:04AM 18   software, the software he uses to feed his family and make

10:34:08AM 19   money, and compare it -- hand it to an independent third

10:34:11AM 20   party --

10:34:12AM 21             THE COURT:  Who might that be?

10:34:14AM 22             MR. WHITAKER:  What we would like to do is have

10:34:16AM 23   perhaps two or three recommended experts on their side,

10:34:18AM 24   two or three on our side, and pick from among them, some

10:34:22AM 25   sort of mutual agreement of who that independent third

10:34:25AM 1   party would be.

10:34:27AM 2           THE COURT:  Essentially, you would be seeking an

10:34:31AM 3   expert --  He hasn't agreed to it.  So you are seeking one

10:34:35AM 4   from the court under 706?

10:34:39AM 5           MR. WHITAKER:  Yes, your Honor.

10:34:41AM 6           THE COURT:  And the parties would share the

10:34:42AM 7   expense?

10:34:43AM 8           MR. WHITAKER:  Yes.  Yes.  We believe that will

10:34:47AM 9   put to rest this issue.  We have been pushing hard for

10:34:50AM 10  that for many, many months.  HP Tuners has resisted.

10:34:53AM 11          THE COURT:  Are there experts out there that can

10:34:55AM 12  do this?

10:34:56AM 13          MR. WHITAKER:  Easy enough.  Yes, your Honor.  It

10:34:58AM 14  is a relatively straightforward process.  You just take

10:35:01AM 15  source code on one side, source code on the other --

10:35:03AM 16          THE COURT:  I think I appreciate that.  It is

10:35:07AM 17  sort of unique to this industry?

10:35:09AM 18          MR. WHITAKER:  I do not believe that is the case,

10:35:11AM 19  your Honor.  I believe it's pretty much a straightforward

10:35:14AM 20  software comparison.  And we would invite that.  Still do.

10:35:18AM 21  We believe that would completely eliminate the vast

10:35:21AM 22  majority of the moneymaking issue here.

10:35:23AM 23      The real issue is HP Tuners understands now -- has an

10:35:28AM 24  appreciation that Kevin Sykes-Bonnett did something bad.

10:35:34AM 25  He is remorseful for having done that.

10:35:37AM 1    But in the grand scheme of things, that's actually a
10:35:41AM 2  fairly minor thing, what he did.  HP Tuners has admitted
10:35:43AM 3  this may have been going on for years, yet they have no
10:35:47AM 4  appreciable, no noticeable, no identifiable impact on
10:35:50AM 5  their finances.  They can identify no money.
10:35:53AM 6    Kevin Sykes-Bonnett will testify, to the extent he
10:35:55AM 7  may have received any money, it is very, very paltry in
10:35:59AM 8  comparison to the hundreds of millions of dollars that
10:36:01AM 9  they are alleging.
10:36:03AM 10    That's a relatively minor issue compared to shutting
10:36:07AM 11  down the sale of every dollar that flows into the company
10:36:12AM 12  when -- addressing the irreparable harm issue -- for the
10:36:15AM 13  last ten months we could have disposed of that entire
10:36:19AM 14  issue easily.  There has been a standing issue -- a
10:36:21AM 15  standing offer to do so, and it has been refused, been
10:36:24AM 16  rejected flatly.
10:36:25AM 17    So to the extent that any order should be fashioned,
10:36:30AM 18  we believe that it should -- just based on the simple
10:36:35AM 19  notions of equity, he should be able to continue doing
10:36:38AM 20  what he's doing in the absence of any demonstration or
10:36:41AM 21  effort by HP Tuners' part to prove that he is -- you know,
10:36:45AM 22  he did anything wrong before now.  It hasn't happened, and
10:36:48AM 23  it simply doesn't exist.
10:36:50AM 24    As to the cable, it is the same thing.  Ken Cannata
10:36:56AM 25  is apparently a former owner and lead engineer at HP

10:37:01AM 1  Tuners, left, and is developing -- helped develop another

10:37:08AM 2  cable, which Syked ECU Tuning is selling.  They have now

10:37:13AM 3  developed it.  Ken Cannata, obviously, is the person who

10:37:16AM 4  developed it at HP Tuners.  There is a lot of sort of just

10:37:20AM 5  knowledge -- engineering knowledge in his head.  But he

10:37:24AM 6  has to earn a living.  He can't unlearn what he learned.

10:37:29AM 7          THE COURT:  That doesn't authorize him to take

10:37:32AM 8  intellectual property, trade secrets, what we are talking

10:37:35AM 9  about, essentially, here, and go to a competitor and use

10:37:38AM 10 that obtained trade secret.

10:37:41AM 11         MR. WHITAKER:  That is exactly true, your Honor.

10:37:43AM 12 There are many, many things that are totally absent from

10:37:47AM 13 plaintiff's TRO.  For example, in order to have trade

10:37:50AM 14 secret misappropriation, the first thing you have to have

10:37:53AM 15 is a trade secret.  They have simply assumed away what in

10:37:57AM 16 a trade secrets case is the bulk of the argument.  They

10:38:00AM 17 have to prove what they developed, how they kept it

10:38:02AM 18 secret, how it is not simply industry standard

10:38:05AM 19 communication --

10:38:06AM 20         THE COURT:  You are contending that there is no

10:38:08AM 21 trade secrets contained in the design of the cable?

10:38:11AM 22         MR. WHITAKER:  Yes, your Honor.  That is,

10:38:14AM 23 indeed --  Again, while this cable is brand new --

10:38:18AM 24         THE COURT:  How would Sykes have developed the

10:38:21AM 25 cable but for Cannata's knowledge he gained from HP?

10:38:27AM 1          MR. WHITAKER:  Well, knowledge gained is not

10:38:29AM 2   necessarily a trade secret.  That is simply the experience

10:38:33AM 3   of an engineer.  Plus, they have incorporated other

10:38:37AM 4   engineers to work on this product.  Without using HP

10:38:41AM 5   Tuners -- whatever they have that may be proprietary, it

10:38:46AM 6   is perfectly --  Mr. Cannata, for example, he designed the

10:38:49AM 7   first HP Tuners cable, he could just as easily design

10:38:53AM 8   another one.

10:38:55AM 9          THE COURT:  The cable doesn't fit in the same

10:38:57AM 10  category as the flash drive and the key generator tool?

10:39:01AM 11         MR. WHITAKER:  No, your Honor.  The so-called

10:39:03AM 12  eliminator cable does not.  The Syked Tuning product does

10:39:07AM 13  not.

10:39:08AM 14     There is a request that HP Tuners (sic) return

10:39:11AM 15  something called a -- I think it is called an E38 wiring

10:39:14AM 16  harness.  It is literally just wire, effectively.  There

10:39:18AM 17  was a picture of it posted to Facebook.  They claim that

10:39:21AM 18  it is their proprietary design.  I think we have submitted

10:39:24AM 19  evidence, well, no, Speartech is selling it.  Anybody

10:39:28AM 20  who's got 200 bucks in their pocket can buy it off the

10:39:32AM 21  shelf.  Again, to that first issue, first you have to

10:39:35AM 22  prove that is a trade secret.  If I can go buy it from

10:39:38AM 23  another competitor, the exact same product, off the

10:39:40AM 24  shelf --

10:39:40AM 25         THE COURT:  So you are not conceding the cable?

10:39:43AM 1      MR. WHITAKER:  Exactly right, your Honor.

10:39:46AM 2      In a nutshell, that's where we are on this claim.  We

10:39:49AM 3  think the likelihood of success on the merits is weak.  It

10:39:55AM 4  is nonexistent on the software.  We are no closer -- in

10:39:58AM 5  fact, we are further now away from any likelihood of any

10:40:03AM 6  success on the software.

10:40:04AM 7      As to the cloned cables, it is true, again,

10:40:08AM 8  Mr. Sykes-Bonnett has never denied, that he did acquire a

10:40:13AM 9  clone cable at some time in the past and tried to sell it

10:40:16AM 10  on Facebook or something.  That was one cable.  He didn't

10:40:18AM 11  sell it.  He destroyed it and sent it back.

10:40:22AM 12      HP Tuners is here alleging that Mr. Sykes-Bonnett is

10:40:25AM 13  doing that, is behind that, is selling it.  Untrue.  HP

10:40:29AM 14  Tuners knows it is untrue, because HP Tuners knows who is

10:40:32AM 15  doing it.

10:40:32AM 16      There is a Russian individual named Vladimir

10:40:37AM 17  something or other in New York who all indications point

10:40:41AM 18  to as being the source of all of these cloned cables.  As

10:40:45AM 19  soon as they noticed that, they served discovery on us

10:40:47AM 20  asking for communications with that person, because they

10:40:50AM 21  know that's the guy doing it.

10:40:51AM 22      THE COURT:  Are you conceding the cloned cable in

10:40:54AM 23  this --

10:40:55AM 24      MR. WHITAKER:  We are flatly denying that

10:40:57AM 25  Mr. Sykes-Bonnett is the source of any cloned cable.  He

10:41:00AM 1     did buy one from --

10:41:02AM 2             THE COURT:  So it could be included in the

10:41:04AM 3     restraining order, that he will not use in any way or

10:41:08AM 4     possess this cloned cable?

10:41:12AM 5             MR. WHITAKER:  Certainly.  He is ready to return

10:41:16AM 6     it to HP Tuners.  But, yes.

10:41:22AM 7             THE COURT:  That's all I am asking.

10:41:24AM 8             MR. WHITAKER:  Yes, that's exactly true.

10:41:25AM 9         There was some discussion about initial disclosures.

10:41:27AM 10    We named Ken Cannata.  I don't know if you need any

10:41:31AM 11    response on that.

10:41:33AM 12            THE COURT:  You can give a short response,

10:41:38AM 13    because he is contending this is part of a pattern of

10:41:41AM 14    concealment, and that you, in fact, had Cannata's contact

10:41:44AM 15    information, but made a different statement in your

10:41:49AM 16    disclosures.

10:41:53AM 17            MR. WHITAKER:  In the initial disclosures filed

10:41:55AM 18    at the very beginning we identified Mr. Cannata.  We

10:41:57AM 19    assumed they had contact information that was at least as

10:42:01AM 20    good as ours, because he was a former owner.

10:42:05AM 21        I will admit when those documents were prepared the

10:42:09AM 22    import of Mr. Cannata as a witness separate and apart from

10:42:12AM 23    everybody else was unknown.  But we disclosed him.

10:42:15AM 24        As to Bobbie Cannata, she was not somebody who we

10:42:17AM 25    believed had any knowledge that was relevant to anything.

10:42:21AM 1  She was a silent partner.

10:42:22AM 2          THE COURT:  I think you have answered.  I would

10:42:23AM 3  just say be careful when you are making disclosures.  Be

10:42:27AM 4  sure that it is accurate, when clearly you had contact

10:42:32AM 5  information.  Somebody within the party you represented

10:42:34AM 6  certainly knew that.

10:42:35AM 7          MR. WHITAKER:  Yes, your Honor.  That's

10:42:39AM 8  realistically it.  Again, to the extent any --  This has

10:42:44AM 9  been going on for a long time.  There has been no

10:42:46AM 10  demonstration or evidence that HP Tuners has suffered any

10:42:50AM 11  irreparable harm or will in any fashion at all.

10:42:56AM 12          THE COURT:  All right.  Do you agree a

10:43:00AM 13  preliminary injunction hearing can be set out ten weeks or

10:43:06AM 14  so?

10:43:06AM 15          MR. WHITAKER:  Fair enough, your Honor.  There is

10:43:08AM 16  the issue of the current schedule, I believe, we would

10:43:10AM 17  have to take up and revisit.  Discovery -- the close of

10:43:13AM 18  discovery is relatively imminent.  And expert reports are

10:43:17AM 19  behind us.

10:43:18AM 20          THE COURT:  That's the other thing, can we

10:43:21AM 21  accelerate the entire schedule and have a trial on this

10:43:24AM 22  matter rather than duplicate and have additional expenses

10:43:27AM 23  for a preliminary injunction?

10:43:31AM 24          MR. WHITAKER:  Perhaps.  I haven't mentioned that

10:43:37AM 25  option to the client.  I am certainly in favor of it.  I

10:43:42AM 1   would like resolution quickly.

10:43:43AM 2           THE COURT:  If we are going to get ready for a

10:43:46AM 3   preliminary injunction, my experience is that the

10:43:49AM 4   preliminary injunction is pretty thorough in determining

10:43:54AM 5   factual issues.  The ultimate outcome is going to likely

10:44:07AM 6   abide the preliminary injunction ruling.

10:44:10AM 7           MR. WHITAKER:  Agreed, your Honor.  That's really

10:44:13AM 8   all I have.  If you have more questions, I am happy to

10:44:15AM 9   answer them.

10:44:15AM 10          THE COURT:  Not at this time.  We will go back.

10:44:17AM 11          MR. WHITAKER:  Should we resolve this one and

10:44:20AM 12  then --

10:44:21AM 13          THE COURT:  Yes.  Mr. Bleiman.  We have a

10:44:28AM 14  conceded motion with respect to the key generator tool,

10:44:35AM 15  the flash drive, and the cloned cable.  You can have your

10:44:41AM 16  order on that.

10:44:42AM 17      What I am going to ask you to do, though, is have a

10:44:46AM 18  new proposed order with respect to that.  We will go over

10:44:50AM 19  these other issues, and there may be more to be added.

10:45:02AM 20  Submit that as an agreed order.  That's the way I view it

10:45:06AM 21  at this point.  And that can be submitted by a week from

10:45:12AM 22  today.  So let's confine to the software.

10:45:18AM 23          MR. BLEIMAN:  Correct.  Your Honor, we disagree

10:45:23AM 24  with Mr. Whitaker's representations.  There is millions of

10:45:27AM 25  lines of code here that we are talking about.  This would

10:45:30AM 1    require someone with specific knowledge in this industry.

10:45:36AM 2    We don't believe there is really anyone that could do it,

10:45:41AM 3    and do it for --

10:45:42AM 4             THE COURT:  That strikes me as logical.  I am

10:45:44AM 5    certainly no software expert myself, but it seems to me

10:45:51AM 6    just being a software expert doesn't enable you to

10:45:54AM 7    understand the industry.  Are there such people that can

10:45:58AM 8    be appointed?

10:46:00AM 9             MR. BLEIMAN:  We don't believe so.  I think we

10:46:03AM 10   have addressed that in our papers, as well, the challenges

10:46:07AM 11   there.  It would be someone that would be in the industry,

10:46:09AM 12   likely a competitor.  I can say we don't want a competitor

10:46:14AM 13   having our code, and I would venture a guess that they

10:46:18AM 14   wouldn't either.  Although, again, we believe they --

10:46:22AM 15            THE COURT:  Ultimately is this going to have to

10:46:24AM 16   come down to experts?

10:46:26AM 17            MR. BLEIMAN:  Well, your Honor --

10:46:27AM 18            THE COURT:  Other than the parties themselves are

10:46:32AM 19   internal experts.  But I mean retained experts.  Isn't the

10:46:37AM 20   court going to have to hear from retained experts to

10:46:40AM 21   resolve a dispute between internal experts?

10:46:43AM 22            MR. BLEIMAN:  Yes, on certain parts of this.  For

10:46:45AM 23   example, the parameters list --  We addressed this in the

10:46:48AM 24   first TRO, and we have referenced it here.  The parameters

10:46:54AM 25   list is a couple of thousand lines that relate to

10:47:00AM 1    different features of the car.  There is a description

10:47:04AM 2    from the manufacturer that is in some manufacturer

10:47:16AM 3    verbiage that really doesn't make sense.

10:47:19AM 4          Ten-plus years ago Mr. Prociuk wrote for one

10:47:25AM 5    particular manufacturer description, he called it the max

10:47:30AM 6    torque value.  He just came up with that name.  He did

10:47:36AM 7    this for thousands of different manufacturer names.

10:47:41AM 8          In just what we have seen, Mr. Sykes-Bonnett's

10:47:44AM 9    parameter names are the same.  He put this on Facebook.

10:47:49AM 10   It says max torque value for that same manufacturer name.

10:47:56AM 11         Now, this is something that came out of his brain ten

10:47:58AM 12   years ago.  It is just what he abbreviatedly called it.

10:48:03AM 13   And it is duplicated --

10:48:03AM 14         THE COURT:  It might be in the public domain,

10:48:07AM 15   might it not?

10:48:08AM 16         MR. BLEIMAN:  No.  This is part of our code.

10:48:10AM 17   This is part of our software.  He would not know what we

10:48:13AM 18   named it unless he has it.  We now know he does have it.

10:48:18AM 19   That's one example.

10:48:21AM 20         And then the licensing screen that we showed, it is

10:48:24AM 21   an exact duplicate of our licensing screen.  They say,

10:48:27AM 22   "Oh, that's just general."  The verbiage is exactly the

10:48:30AM 23   same.

10:48:30AM 24         There is a picture that he posted on Facebook.  It

10:48:34AM 25   says, "PCM tools confidential."  It is our confidential

10:48:38AM 1    software.  So he has these things.  We believe he used it

10:48:42AM 2    as a reference.

10:48:44AM 3         Again, I made the comment earlier that it has allowed

10:48:50AM 4    him to implement algorithms to support a number of

10:48:54AM 5    different vehicles that he hadn't previously supported,

10:48:58AM 6    because he had our code and was able to see how we were

10:49:00AM 7    doing it, and so he could quickly bring those on.

10:49:04AM 8         So while it may not be an exact duplicate --  And who

10:49:09AM 9    knows what he has done to change it since the outset.

10:49:13AM 10   There has been incorporation, there has been reference,

10:49:16AM 11   there has been use, there has been reliance on our code to

10:49:20AM 12   develop his software.

10:49:22AM 13        In addition, in discovery --  And I'm glad we briefly

10:49:27AM 14   brought up the discovery schedule, because we also filed a

10:49:30AM 15   motion to compel, and for sanctions, and to amend the

10:49:35AM 16   schedule based on all these discovery abuses that I

10:49:38AM 17   outlined.

10:49:40AM 18        But Mr. Whitaker made the comment, "This has been

10:49:43AM 19   going on a long time."  Well, we haven't gotten any

10:49:46AM 20   documents or information.  They have concealed it all.

10:49:50AM 21   They have withheld it all.  We need to see this stuff.

10:49:53AM 22        For example, we asked for a beta version of their

10:49:55AM 23   software, dated April 7th, in discovery.  That was

10:49:58AM 24   supposed to be produced months and months ago.  We still

10:50:01AM 25   don't have it.  That is what he showed on the screen that

10:50:06AM 1   duplicated our parameters names in that picture he put on

10:50:11AM 2   Facebook of that screen, where we got wind that he had our

10:50:16AM 3   name somehow.

10:50:21AM 4       There is quite a bit of discovery.  They haven't

10:50:24AM 5   produced a lot of the information and documents that we

10:50:29AM 6   have asked for.

10:50:30AM 7       As it relates to the restraining order, though, that

10:50:33AM 8   we are talking about today, the harness issue, we

10:50:38AM 9   disagree.  That's a proprietary harness that Mr. Prociuk

10:50:42AM 10  developed.  The harness they show -- and we put this in

10:50:46AM 11  our declaration and our reply -- is a different harness.

10:50:50AM 12      Speartech does sell a harness publicly, but not our

10:50:54AM 13  harness.  We have a proprietary harness that is different

10:50:57AM 14  from what's publicly offered that they have.  They have it

10:51:01AM 15  because Mr. Cannata gave it to them.  And they shouldn't

10:51:03AM 16  have it.  They developed their product using our harness.

10:51:15AM 17      And there is pictures, again, on Facebook, that

10:51:19AM 18  Mr. Sykes-Bonnett posted, showing our harness on his desk.

10:51:27AM 19  That's ours.  This.  I am pointing to one of the exhibits.

10:51:31AM 20          THE COURT:  Of course, I can't see it.  But I

10:51:34AM 21  realize it is in the record.

10:51:38AM 22      I think I have heard enough.  I do want to come back

10:51:41AM 23  briefly here to Mr. Whitaker and ask about the harness.

10:51:46AM 24  Where are we on the harness?

10:51:49AM 25          MR. WHITAKER:  May I briefly respond?

10:51:51AM 1           THE COURT:  Very briefly.

10:51:52AM 2           MR. WHITAKER:  Very briefly.  All of that

10:51:55AM 3 pertains to what I said earlier, what is a trade secret.

10:51:58AM 4 The fact that this information was visible on Facebook,

10:52:00AM 5 just like it would be from HP Tuners if somebody put up a

10:52:04AM 6 screenshot of a picture of HP Tuners' on Facebook, makes

10:52:07AM 7 it clearly what the judge -- what the court has said,

10:52:10AM 8 public domain.  It is not a trade secret.  You have to

10:52:13AM 9 keep it a secret in order for it to be a secret.  If it is

10:52:17AM 10 visible on Facebook, it is not a trade secret.  That's

10:52:20AM 11 realistically all I want to say.  Other than the document

10:52:22AM 12 production is a major --

10:52:23AM 13           THE COURT:  Are you using this wiring harness,

10:52:26AM 14 this A38?

10:52:30AM 15           MR. WHITAKER:  I believe it has been used in the

10:52:32AM 16 past.

10:52:34AM 17           THE COURT:  Do you intend to use it in the

10:52:36AM 18 future?

10:52:36AM 19           MR. WHITAKER:  You could use it, or you could

10:52:38AM 20 just use one of the exact same things you can buy from

10:52:42AM 21 Speartech.  It may look different, but, back to the

10:52:45AM 22 trade-secret issue, they are functionally identical.

10:52:48AM 23 There is nothing proprietary about it.  It is just wires

10:52:51AM 24 wired up a certain way.  There is nothing proprietary at

10:52:55AM 25 all.

10:52:55AM 1        THE COURT:  So you are telling me it is disputed?

10:52:58AM 2        MR. WHITAKER:  Disputed.  Yes, your Honor.  Is

10:53:02AM 3  that it?

10:53:03AM 4        THE COURT:  That's it on the plaintiff's motion

10:53:06AM 5  for temporary restraining order.  I guess you can resume

10:53:09AM 6  the podium, if that's where you prefer to address the

10:53:12AM 7  court on your motion.

10:53:13AM 8        MR. BLEIMAN:  Your Honor, may I ask a question?

10:53:15AM 9        THE COURT:  Yes.

10:53:16AM 10        MR. BLEIMAN:  Because there are some other things

10:53:18AM 11  we have asked for in the TRO, like an order preventing

10:53:23AM 12  them from releasing our source code, open sourcing our

10:53:28AM 13  source code.  We don't, candidly, trust that we are going

10:53:33AM 14  to get back everything that he has, or that he doesn't

10:53:36AM 15  have copies of it, in light of everything that has gone

10:53:40AM 16  on.  So we would like restrictions that prevent him from

10:53:44AM 17  releasing our software publicly, or open sourcing our

10:53:48AM 18  software, or releasing our code.

10:53:52AM 19        THE COURT:  The contention, as I understand it,

10:53:55AM 20  is the source code is not in their software.

10:54:01AM 21        MR. BLEIMAN:  No, but they have the flash drive

10:54:05AM 22  with our source code on it.

10:54:07AM 23        THE COURT:  I see.  You are just asking about

10:54:10AM 24  elaboration of that which the court is going to grant with

10:54:14AM 25  respect to the flash drive and the key generator tool.

10:54:19AM 1   You are saying it should also preclude further disclosure.

10:54:24AM 2   I think that's all -- or dissemination.  That's what you

10:54:28AM 3   are seeking, and I think, essentially, that's agreed to.

10:54:30AM 4            MR. BLEIMAN:  Yeah.  I mean, there is a bunch of

10:54:31AM 5   additional --

10:54:32AM 6            THE COURT:  That is essentially agreed to.

10:54:35AM 7            MR. BLEIMAN:  We will try to work together to

10:54:37AM 8   fashion the relief.

10:54:38AM 9            THE COURT:  That's what I am asking.  I think you

10:54:40AM 10  need to be satisfied that it is thorough enough to fulfill

10:54:42AM 11  the purpose.  I don't want to sit here and try and craft

10:54:48AM 12  all the particular language.  I am going to ask

10:54:51AM 13  Mr. Whitaker to work with you.  I understand that Sykes is

10:55:00AM 14  conceding these points, so it should be broad to protect

10:55:07AM 15  those items.

10:55:10AM 16           MR. BLEIMAN:  As far as the sale of the

10:55:11AM 17  competitive products or the turn-over of a cable so we can

10:55:15AM 18  have it examined, try to work together on that?  Are you

10:55:22AM 19  ruling on that?

10:55:23AM 20           THE COURT:  Are we talking about the cloned

10:55:26AM 21  cable?

10:55:26AM 22           MR. BLEIMAN:  No.  We are talking about the Syked

10:55:29AM 23  eliminator cable.

10:55:30AM 24           THE COURT:  The eliminator cable?

10:55:39AM 25           MR. BLEIMAN:  Right.

10:55:40AM 1          THE COURT:  You want one of theirs for what

10:55:44AM 2     purpose?

10:55:45AM 3          MR. BLEIMAN:  To forensically examine it so that

10:55:48AM 4     we can demonstrate that it is a duplicate of our cable.

10:55:49AM 5          THE COURT:  That seems like a discovery issue.

10:55:51AM 6     Is there any problem with that?

10:55:53AM 7          MR. WHITAKER:  No, your Honor, with the

10:55:54AM 8     understanding that normal discovery rules apply.

10:55:57AM 9          THE COURT:  Right.  There will be a protective

10:56:01AM 10    order and so forth.  You should be able to work that out.

10:56:04AM 11         MR. BLEIMAN:  As far as him, Mr. Sykes, being

10:56:19AM 12    able to continue selling the software and the cable

10:56:23AM 13    publicly pending the hearing on preliminary injunction, is

10:56:27AM 14    that something you are going to rule on?

10:56:29AM 15         THE COURT:  I am going to rule on that.  We can

10:56:32AM 16    take it up right now.  I don't know that we have made

10:56:36AM 17    enough progress here from where we were ten months ago.

10:56:45AM 18    The big problem is likelihood to prevail on the merits.

10:56:48AM 19    There are lots of contested issues here.  The court can't

10:56:51AM 20    make a factual finding at this point that either party is

10:56:54AM 21    likely to succeed.  The assertions in some cases are just

10:56:59AM 22    poles apart.

10:57:01AM 23         And furthermore, the hardships, I think, in this

10:57:04AM 24    case, weigh in favor of the defendant.  Just how much his

10:57:12AM 25    business might be destroyed is difficult to evaluate.  But

10:57:16AM 1    I don't think that there has been really a dispute that it

10:57:24AM 2    would, if not destroy his business substantially for the

10:57:27AM 3    period of this litigation, impair his ability to make the

10:57:31AM 4    business --  And it may cause it to fail.  And so the

10:57:35AM 5    other elements are neutral with regard to public interest,

10:57:39AM 6    and so forth.

10:57:41AM 7        I am going to deny it with respect to the software.

10:57:46AM 8    And then we will talk about a preliminary injunction

10:57:49AM 9    hearing.  I will come back to that and we will talk about

10:57:55AM 10   that.

10:57:56AM 11       I also want to talk about an expert, the appointment

10:58:02AM 12   of an expert, that is authorized under the Federal Rules

10:58:07AM 13   of Evidence to assist the court here.  But I am open on

10:58:11AM 14   that.  As I said, we will talk about that further.

10:58:14AM 15       I wanted to take up the defendant's motion here.

10:58:18AM 16       MR. WHITAKER:  Very briefly, your Honor, I think

10:58:23AM 17   the motion sort of speaks for itself.  We were shocked and

10:58:26AM 18   floored last week when we saw all this information

10:58:30AM 19   produced by the plaintiff that revealed that someone

10:58:35AM 20   professing to be an anonymous hacker had access to

10:58:39AM 21   someone's email.  It is currently unclear whether it was

10:58:42AM 22   Mr. Kevin Sykes-Bonnett's email or someone else's email,

10:58:44AM 23   perhaps Ken Cannata's, but was pillaging through lots of

10:58:48AM 24   very confidential information.

10:58:49AM 25       THE COURT:  Is this illegal conduct?

10:58:51AM 1         MR. WHITAKER:  Yes, it is, your Honor.

10:58:52AM 2         THE COURT:  Is it criminal conduct?

10:58:54AM 3         MR. WHITAKER:  I believe that it is.  Some of the

10:58:55AM 4 conduct is.  There is reference --  We have not briefed

10:59:00AM 5 it, but there is reference to recordings of

10:59:01AM 6 Mr. Sykes-Bonnett's voice, which would have been a

10:59:04AM 7 violation of the Wiretap Act, clearly.  As the court is

10:59:09AM 8 aware, it is two-party consent in this court --

10:59:13AM 9         THE COURT:  In this state.

10:59:14AM 10         MR. WHITAKER:  In this state, yes.  None of this

10:59:17AM 11 was authorized, certainly.  There are some ideas about who

10:59:21AM 12 perhaps did it.  Those ideas sort of fuel the notion of

10:59:26AM 13 why that person or the person professing to be anonymous

10:59:30AM 14 would like to be -- would like some immunity from

10:59:33AM 15 prosecution by HP Tuners, or whoever, perhaps the

10:59:37AM 16 government.  It is unclear.

10:59:39AM 17         THE COURT:  I don't have enough information to

10:59:42AM 18 draw any conclusions, of course.  But on the face of it,

10:59:46AM 19 it is clear that it could conceivably implicate criminal

10:59:51AM 20 violations here.

10:59:53AM 21         MR. WHITAKER:  Indeed, your Honor.  Indeed it

10:59:54AM 22 could, by multiple people.  I think we have set out --

10:59:57AM 23 it's cut and dried, a pretty obvious case, this is trade

11:00:00AM 24 secrets, identified as such, that were acquired under

11:00:03AM 25 circumstances which to any reasonable person --

11:00:05AM 1          THE COURT:  Trade secrets by itself could be a

11:00:08AM 2   civil matter.  But once somebody is hacking into a private

11:00:12AM 3   email --

11:00:17AM 4          MR. WHITAKER:  People do go to jail for that.  I

11:00:20AM 5   know one person who actually went to jail for hacking into

11:00:23AM 6   an Xbox in violation of the Stored Communications Act.

11:00:26AM 7   Yes, very serious conduct, we believe.

11:00:29AM 8      We believe that the evidence has shown --

11:00:34AM 9   demonstrates pretty clearly, it's kind of a cut-and-dried

11:00:36AM 10  case, there is a substantial likelihood on the merits in

11:00:40AM 11  those.

11:00:41AM 12     We concede the weakness in this case.  Since Thursday

11:00:43AM 13  we have not added those claims to this case.  We believe

11:00:47AM 14  that motion is imminent.  In fact, I would move now for

11:00:50AM 15  leave to add claims in this case to include --

11:00:53AM 16         THE COURT:  You need to file that.  There needs

11:00:58AM 17  to be supporting pleadings and an opportunity to oppose

11:01:03AM 18  formally.

11:01:04AM 19         MR. WHITAKER:  That is imminent, to that extent.

11:01:07AM 20     In terms of irreparable harm, much the way HP Tuners

11:01:11AM 21  has said, Syked Tuning --  We don't know.  We have no idea

11:01:17AM 22  what they've got.  We know there was apparently random

11:01:19AM 23  access, unfettered access to somebody's email.  We are not

11:01:23AM 24  sure if it is Mr. Sykes-Bonnett's email.

11:01:27AM 25     There is a lot of stuff in there that is clearly

11:01:29AM 1   confidential.  We don't know what they have.  They haven't

11:01:32AM 2   given us some sort of clear accounting under oath that we

11:01:34AM 3   can attest to, that we know what they've got.

11:01:39AM 4        What we are asking for is all of the above.

11:01:41AM 5   Essentially, pretty direct, simple, common-sense relief,

11:01:45AM 6   which is identify under oath in sworn testimony everything

11:01:48AM 7   that was provided --

11:01:52AM 8            THE COURT:  These are basically discovery issues

11:01:54AM 9   more than a TRO, as far as I can tell.

11:01:57AM 10           MR. WHITAKER:  Well, sort of.

11:02:00AM 11           THE COURT:  I will come back to you.  Let me hear

11:02:05AM 12  from Mr. Bleiman.  We will go through the relief that's

11:02:10AM 13  requested.  I think much of it is conceded here.

11:02:13AM 14  Mr. Bleiman.

11:02:14AM 15           MR. BLEIMAN:  This is attempted misdirection and

11:02:20AM 16  exaggeration from what's really going on.  First of all,

11:02:24AM 17  this person never professed to be a hacker, nor do we have

11:02:31AM 18  any information or understanding that this person is a

11:02:34AM 19  hacker.  They have never communicated to us they were a

11:02:38AM 20  hacker.

11:02:40AM 21           THE COURT:  They communicated to you they had

11:02:42AM 22  email access?

11:02:44AM 23           MR. BLEIMAN:  They said they had some emails.

11:02:47AM 24  That's the way that I understood it, between Sykes and

11:02:51AM 25  Cannata.

11:02:53AM 1    Now, we don't know how he got those emails, if he was

11:02:56AM 2    copied on those emails, forwarded those emails.  All we

11:03:00AM 3    understood is that this person had engaged in TeamViewer

11:03:07AM 4    sessions with Mr. Sykes-Bonnett.

11:03:10AM 5    Now, a TeamViewer session is a shared computer

11:03:14AM 6    screen.  I'm not sure if you are familiar with it.

11:03:16AM 7            THE COURT:  No.

11:03:18AM 8            MR. BLEIMAN:  It is a voluntary session.

11:03:20AM 9    Somebody can't TeamView with another person and share

11:03:23AM 10   their screen unless they do it together.

11:03:25AM 11           THE COURT:  So you are suggesting that this

11:03:27AM 12   anonymous person may have been TeamViewing with the two of

11:03:30AM 13   them?

11:03:31AM 14           MR. BLEIMAN:  Well, that's what they said in the

11:03:33AM 15   emails.  We have produced everything we have with this

11:03:38AM 16   anonymous informant.

11:03:41AM 17   We never asked for any information of Sykes.  We are

11:03:45AM 18   not interested in Sykes' information.  We have no use for

11:03:49AM 19   it.  Again, our contention here is they have stolen all of

11:03:53AM 20   our stuff and incorporated it into their own.  We never

11:03:57AM 21   requested any of Sykes' information.  It was never --

11:04:01AM 22           THE COURT:  Let's go through the request.  The

11:04:03AM 23   request is to immediately segregate all documents and

11:04:07AM 24   things provided by the anonymous person or hacker to

11:04:12AM 25   anyone, including anyone affiliated with HPT.

11:04:16AM 1          MR. BLEIMAN:  Again, as you stated, and I think I

11:04:19AM 2   put in the papers, I believe this is a discovery issue.

11:04:23AM 3   We have produced every document exchanged with the

11:04:26AM 4   anonymous informant.  There were three emails and some

11:04:31AM 5   images.  I am happy to forward the actual email to

11:04:39AM 6   Mr. Whitaker so he has an electronic version.

11:04:43AM 7          THE COURT:  All right.  The answer is you have

11:04:47AM 8   segregated it and you will provide it?

11:04:49AM 9          MR. BLEIMAN:  We have provided it, but not the

11:04:52AM 10  electronic copy.

11:04:54AM 11          THE COURT:  The second is, "Immediately safeguard

11:04:56AM 12  all documents and things provided by the anonymous

11:05:01AM 13  person," and, "Treat all those documents as attorneys'

11:05:10AM 14  eyes only."

11:05:11AM 15          MR. BLEIMAN:  I disagree with that.  Again, this

11:05:13AM 16  isn't a TRO issue.  This is a discovery issue.  The

11:05:16AM 17  documents that he emailed me about on the 17th that he had

11:05:21AM 18  an issue with, we did immediately make them attorneys'

11:05:27AM 19  eyes only.  The client never accessed --

11:05:29AM 20          THE COURT:  You basically concede that?

11:05:32AM 21          MR. BLEIMAN:  Yes.

11:05:32AM 22          THE COURT:  Again, from my point, this is a

11:05:34AM 23  discovery matter.  I am not talking about entering a

11:05:37AM 24  restraining order.  Your representation as an officer of

11:05:42AM 25  the court on this discovery issue is sufficient, as far as

11:05:44AM 1   I am concerned.

11:05:45AM 2           MR. BLEIMAN:  So we have done that.  Again, I

11:05:50AM 3   don't think every document is attorneys' eyes only that

11:05:56AM 4   this informant provided to us.  The information that he

11:06:01AM 5   challenged --  I mean, we were provided with the images.

11:06:04AM 6   We attached those to our renewed emergency motion for TRO.

11:06:09AM 7   That's an image of the computer screen showing our stuff

11:06:13AM 8   on his computer.  That's not, I don't believe, attorneys'

11:06:17AM 9   eyes only.

11:06:18AM 10      The two documents, the hardware design document and

11:06:22AM 11  the binary files, that has been segregated as attorneys'

11:06:27AM 12  eyes only.

11:06:28AM 13          THE COURT:  All right.  Mr. Whitaker, I believe

11:06:31AM 14  that satisfies the request on that.

11:06:35AM 15          MR. WHITAKER:  Largely, your Honor.  My response

11:06:39AM 16  would be, if he is willing to represent that we have been

11:06:42AM 17  provided a copy of everything, we will, obviously,

11:06:46AM 18  represent to the court we will accept that.

11:06:48AM 19      As to segregating and treating as AEO, there is a --

11:06:53AM 20  it should be apparent that there is some concern about

11:06:55AM 21  confidential information getting leaked out.  If any of

11:06:59AM 22  that information has been shared with anyone else, the

11:07:04AM 23  protective order --

11:07:05AM 24          THE COURT:  I will ask you to work out the

11:07:07AM 25  attorneys'-eyes-only documents, and bring it to the

11:07:12AM 1    court's attention if you can't reach an agreement as to

11:07:16AM 2    what would otherwise have been undiscoverable.  I will let

11:07:23AM 3    you work that out.

11:07:25AM 4         I am going to move on to 3, which is, "Identify, by

11:07:28AM 5    name and position at HPT, each and every individual who

11:07:31AM 6    has had access to or been provided a copy of any of the

11:07:35AM 7    documents and things provided by the anonymous person and

11:07:41AM 8    which of those documents and things were provided."

11:07:45AM 9    That's a discovery matter.  Again, can you comply with

11:07:49AM 10   that request?

11:07:50AM 11               MR. BLEIMAN:  In connection with discovery, sure.

11:07:53AM 12               THE COURT:  Can there not be expedited discovery

11:07:56AM 13   on this, because this doesn't seem to be too complicated a

11:08:03AM 14   question?

11:08:07AM 15               MR. BLEIMAN:  Your Honor, I will tell you right

11:08:09AM 16   now, it is three individuals.

11:08:10AM 17               THE COURT:  Good.  You can provide that after the

11:08:12AM 18   hearing today, the names and contact information.

11:08:17AM 19        Moving to 4, "Produce to Syked Tuning every document

11:08:22AM 20   and thing, including all communication provided by, or to,

11:08:25AM 21   or exchanged with the anonymous hacker."  Again, this

11:08:30AM 22   appears to be valid.  I think you have already indicated

11:08:35AM 23   that you would.

11:08:37AM 24               MR. BLEIMAN:  We have.  Except there is -- they

11:08:40AM 25   don't have the electronic copies of the particular emails

|            |    |                                                              |
|------------|----|--------------------------------------------------------------|
| 11:08:44AM | 1  | with attachments, which I can forward to Mr. Whitaker.       |
| 11:08:51AM | 2  | They have the attachments, I think, or the reference to      |
| 11:08:56AM | 3  | the attachments.  There is only three or four emails that    |
| 11:08:59AM | 4  | have attachments.                                            |
| 11:09:00AM | 5  |         THE COURT:  Again, that need not have a formal        |
| 11:09:02AM | 6  | order.  We have a transcript here of what is going to        |
| 11:09:07AM | 7  | transpire.  Yes?                                             |
| 11:09:07AM | 8  |         MR. WHITAKER:  The only question is, I would ask      |
| 11:09:09AM | 9  | for confirmation that is ongoing -- in connection with the   |
| 11:09:14AM | 10 | next number, there is an ongoing obligation --  Because      |
| 11:09:16AM | 11 | while we know what --                                        |
| 11:09:17AM | 12 |         THE COURT:  No. 5?                                    |
| 11:09:18AM | 13 |         MR. WHITAKER:  No. 5, yes.                            |
| 11:09:19AM | 14 |         THE COURT:  I haven't gotten to it yet.  That is     |
| 11:09:22AM | 15 | my next question.  What is your position on ceasing all      |
| 11:09:26AM | 16 | communication with the anonymous alleged hacker?             |
| 11:09:30AM | 17 |         MR. BLEIMAN:  Again, I don't classify him as a       |
| 11:09:34AM | 18 | hacker.  I don't believe that we should be restricted from   |
| 11:09:39AM | 19 | communicating with a person who clearly has information      |
| 11:09:48AM | 20 | that they have concealed from us for more than a year.       |
| 11:09:51AM | 21 |     And if they communicate to us or provide us with         |
| 11:09:54AM | 22 | additional images or evidence, I don't --  You know,         |
| 11:10:01AM | 23 | Mr. Whitaker made various claims about illegal conduct,      |
| 11:10:05AM | 24 | criminal conduct.  I don't know that to be the case.         |
| 11:10:11AM | 25 |     Clearly, Mr. Sykes-Bonnett knows exactly who this        |

11:10:14AM 1   person is.  I think the better solution, in connection

11:10:22AM 2   here with these discovery-related issues, is for them to

11:10:26AM 3   identify who they believe this may be, provide us with a

11:10:30AM 4   list of names, and let's have equal access to try to

11:10:33AM 5   figure out who this person is, what they have, and how

11:10:36AM 6   they got the information.

11:10:39AM 7        We have been completely transparent, candid, and

11:10:45AM 8   forthright in this entire situation.  The same cannot be

11:10:48AM 9   said for them.  They have hidden all these facts.

11:10:51AM 10        THE COURT:  My only concern here is --  You said

11:10:55AM 11   you don't acknowledge this as a hacker.  It is not

11:10:59AM 12   established as a matter of fact or law in this court that

11:11:04AM 13   there was an unauthorized, illegal access to an email

11:11:12AM 14   server.  But it is of concern to the court if a party is

11:11:28AM 15   obtaining information from such an unauthorized, illegal

11:11:32AM 16   source.

11:11:33AM 17        I am not going to restrict your communication with

11:11:38AM 18   this anonymous person, because I don't know of any

11:11:41AM 19   authority, really, in a civil matter, for a court to issue

11:11:47AM 20   sort of a gag order in connection with this.  I don't know

11:11:51AM 21   who this person is either.  Whether they have relevant

11:11:54AM 22   information concerning this case, it is perfectly lawful.

11:12:00AM 23   I am not going to grant that.  I am only cautioning that

11:12:03AM 24   this court is concerned with the allegations.

11:12:08AM 25        MR. BLEIMAN:  Understood.  Your Honor, on that

| | |
|---|---|
| 11:12:10AM 1 | point, I think it is important to note that the emails |
| 11:12:15AM 2 | that we have produced, that this person provided, suggest |
| 11:12:22AM 3 | a very intricate and detailed knowledge of how the |
| 11:12:27AM 4 | software is created, specific implementation of certain |
| 11:12:31AM 5 | algorithms, the development of the communication protocol, |
| 11:12:38AM 6 | all of which they've admitted to and have disclosed in |
| 11:12:42AM 7 | these declarations.  The information is very credible. |
| 11:12:47AM 8 | It lends credence to our belief that this is a former |
| 11:12:53AM 9 | partner, programmer, consultant, advisor, someone that was |
| 11:12:58AM 10 | also working with Mr. Sykes-Bonnett who had inside access |
| 11:13:03AM 11 | to all of this information.  There was presumably some |
| 11:13:08AM 12 | disagreement or falling out, perhaps, which caused them to |
| 11:13:12AM 13 | come forward and communicate this stuff to us. |
| 11:13:15AM 14 | But, again, it gets back to the point of --  And we |
| 11:13:18AM 15 | have asked for this information in discovery.  And, yes, |
| 11:13:21AM 16 | the due date isn't there yet.  But we have been open and |
| 11:13:24AM 17 | forthright. |
| 11:13:25AM 18 | I think they should identify in connection with |
| 11:13:28AM 19 | discovery who the universe of people that they believe |
| 11:13:31AM 20 | this might be, as well as their knowledge of their contact |
| 11:13:35AM 21 | information.  Clearly that would be relevant as a |
| 11:13:40AM 22 | supplement to their initial disclosures.  It is an issue |
| 11:13:43AM 23 | now in the case.  I believe they have an affirmative |
| 11:13:47AM 24 | obligation to provide that type of information to us. |
| 11:13:50AM 25 | THE COURT:  Another discovery matter.  There is |

11:13:56AM 1   no order with respect to that, just the court's cautionary

11:14:02AM 2   statements here.

11:14:03AM 3       The sixth is, "Provide an accounting of all monies,

11:14:07AM 4   funds, or other form of compensation provided to the

11:14:09AM 5   hacker."  Again, this seems like a reasonable discovery

11:14:14AM 6   request.

11:14:16AM 7           MR. BLEIMAN:  I don't believe so.  I think that

11:14:20AM 8   it is irrelevant.  They haven't made that request in

11:14:25AM 9   discovery.  I think if they make that request in

11:14:28AM 10  discovery --

11:14:29AM 11          THE COURT:  If they make it, you refuse it, and

11:14:31AM 12  there is a motion to compel, the court is going to likely

11:14:34AM 13  grant it.  You say it is not relevant.  It could go to the

11:14:38AM 14  credibility of this informant, that sort of thing.

11:14:41AM 15          MR. BLEIMAN:  Sure.  Okay.

11:14:43AM 16          THE COURT:  I would request that you just simply

11:14:46AM 17  fulfill this as a discovery request.

11:14:50AM 18          MR. BLEIMAN:  Understood.

11:14:51AM 19          THE COURT:  Seven, "Refrain from ever again

11:14:54AM 20  soliciting confidential information from Syked Tuning

11:14:59AM 21  under circumstances which would lead any reasonable person

11:15:01AM 22  to believe that such confidential information was likely

11:15:04AM 23  obtained through illegal means."  I am not going to order

11:15:09AM 24  that.  I have already made my comments about the

11:15:11AM 25  proprietariness of working with somebody who there is

11:15:22AM 1   reason to believe -- a reasonable person would believe

11:15:28AM 2   that they are trading in illegally-gained information.

11:15:33AM 3        Number 8 is, "Provide an affidavit attesting that HPT

11:15:38AM 4   and its counsel have complied with each and every one of

11:15:41AM 5   the foregoing provisions."  The same comment I made

11:15:43AM 6   earlier, your representations made here in court are

11:15:48AM 7   sufficient for this court, as an officer of the court.

11:15:56AM 8        Now I want to talk about experts.  I have already

11:16:07AM 9   mentioned I would have expected that the parties would be

11:16:10AM 10  hiring experts -- retained experts under 703 to render

11:16:20AM 11  opinions with respect to the inclusion of source code and

11:16:24AM 12  software.  But it also seems to me that this issue can be

11:16:32AM 13  moved along by the appointment of an expert under Rule 706

11:16:41AM 14  of the rules of evidence.

11:16:50AM 15       I came into this hearing believing that was the

11:16:54AM 16  better choice.  But obtaining a qualified expert is an

11:16:59AM 17  issue that is in dispute here.

11:17:05AM 18       But if this matter goes to trial, aren't we going to

11:17:08AM 19  have to have -- we don't have to have, the parties can

11:17:15AM 20  rely on their own internal programmers, and so forth.

11:17:21AM 21  Tell me, what's going to happen here?  Will experts be

11:17:26AM 22  retained?  Have they been retained on this issue?

11:17:30AM 23       MR. BLEIMAN:  Your Honor, we have a motion that

11:17:33AM 24  is pending on the adjustment of the schedule, including

11:17:37AM 25  the expert disclosure deadlines.  There is actually two

11:17:40AM 1    separate motions.  We do contemplate an expert.  We have

11:17:45AM 2    asked in discovery for production of their code so that we

11:17:54AM 3    can have it analyzed.  They haven't produced that despite

11:18:01AM 4    a number of requests.  We have asked for that beta

11:18:05AM 5    version.

11:18:06AM 6           THE COURT:  Has there been a protective order?

11:18:11AM 7           MR. BLEIMAN:  Yes.

11:18:11AM 8           THE COURT:  So it could be provided under a

11:18:14AM 9    protective order.

11:18:14AM 10          MR. BLEIMAN:  We have reservations of turning our

11:18:18AM 11   code over in light of everything that has happened.

11:18:20AM 12          THE COURT:  I don't know how we go to trial if

11:18:22AM 13   codes aren't --

11:18:23AM 14          MR. BLEIMAN:  There are components of the code,

11:18:24AM 15   the parameter list issue, the licensing screen issue,

11:18:30AM 16   there is the ability to support certain vehicles that may

11:18:37AM 17   not require a complete analysis of all the code, just

11:18:46AM 18   parts of it.

11:18:47AM 19       But there is a high degree of apprehension here that

11:18:49AM 20   what we are going to get is the real thing.  That's only

11:18:53AM 21   because of everything that has gone on here in this case

11:19:02AM 22   and the course of conduct that started in May of 2017 when

11:19:07AM 23   the issue of -- some of these issues first surfaced.  So

11:19:13AM 24   it is a difficult issue.

11:19:17AM 25       I think if we start with the parameters names that

11:19:21AM 1    they were supposed to produce long ago, and the beta

11:19:25AM 2    version, that's a start for us, before getting involved

11:19:29AM 3    with all the experts and appointing independent experts.

11:19:35AM 4    We thought we would have that information in March or

11:19:38AM 5    April, and we still don't have it.  Mr. Whitaker has made

11:19:42AM 6    a number of comments, "Well, let's just turn it over."  We

11:19:48AM 7    don't know that we need to go to that extreme.

11:19:49AM 8         THE COURT:  Is that an extreme, or is that maybe

11:19:52AM 9    the best solution where there are such strong contests, on

11:20:00AM 10   your part, if not the other, and distrust over this, in

11:20:03AM 11   which an independent expert, who has fealty to neither

11:20:08AM 12   party, is more likely to obtain and get the necessary

11:20:12AM 13   information after consulting with you and your client and

11:20:17AM 14   with defense?

11:20:18AM 15        MR. BLEIMAN:  I don't believe they are mutually

11:20:20AM 16   exclusive.  I think both, perhaps, are the right path.  We

11:20:24AM 17   do need the parameters names that were supposed to be

11:20:27AM 18   produced long ago.  We do need the beta version that was

11:20:30AM 19   supposed to be produced long ago.

11:20:32AM 20       As far as the independent expert, again, we are very

11:20:35AM 21   concerned that there isn't really somebody out there,

11:20:41AM 22   short of a competitor in this industry, that knows this

11:20:44AM 23   industry, that is going to be able to do it.

11:20:46AM 24        THE COURT:  You just a moment ago said you wanted

11:20:49AM 25   the expert deadline, that you were going to secure an

11:20:53AM 1    expert.

11:20:54AM 2           MR. BLEIMAN:  Correct.  We haven't yet.  We have

11:20:56AM 3    had difficulty finding that particular person.  Also, we

11:21:02AM 4    have nothing for them to look at, because we don't have

11:21:04AM 5    any of the information that was supposed to be produced

11:21:07AM 6    long ago.  Until we have the parameters list and we have

11:21:12AM 7    the beta version, there was nothing even to discuss with

11:21:17AM 8    any expert.

11:21:18AM 9           There are components of his code that we believe --

11:21:22AM 10   Excuse me.  There are components of our code that have

11:21:25AM 11   been incorporated into his code.  I don't think we are

11:21:29AM 12   saying, or have ever said, it is an exact duplication.

11:21:34AM 13   For him to do that would, quite frankly, not be very

11:21:39AM 14   smart.

11:21:41AM 15          I think there is unquestionably going to be

11:21:47AM 16   incorporation of components, like I said, the

11:21:50AM 17   implementation of certain algorithms, and other things,

11:21:54AM 18   that you will find in his code.

11:21:56AM 19          I also believe that there are -- what we will be able

11:22:03AM 20   to see is that his use of our admin software and some of

11:22:07AM 21   the other intellectual property that he had of ours was

11:22:09AM 22   referenced in connection with the development of his code.

11:22:14AM 23          These products have taken ten-plus years and hundreds

11:22:22AM 24   of thousands of man hours to put all this together, with

11:22:27AM 25   multiple people working on this.  This is their only

11:22:32AM 1    engineer, Mr. Sykes-Bonnett.  There is just simply not

11:22:35AM 2    enough time in the day to do everything that he has done

11:22:40AM 3    without incorporation of our stuff.

11:22:45AM 4         That is, I think, a fundamental disconnect here that

11:22:48AM 5    exists, that it is just not possible.  Where is the

11:22:53AM 6    evidence of who his development people are, and the amount

11:22:56AM 7    of money he spent in development, and all the engineers

11:22:59AM 8    that have been working on this?  It doesn't exist because

11:23:02AM 9    he doesn't have it.

11:23:05AM 10        We can put our people up on the stand and testify in

11:23:10AM 11   terms of what it took, what it involved, how intensive it

11:23:14AM 12   was to develop all of these things, and he can't.

11:23:20AM 13        You know, even with --  The expert will certainly

11:23:24AM 14   assist, but there is also party evidence and testimony

11:23:28AM 15   that is going to be presented that will, I think,

11:23:34AM 16   demonstrate that there is just no way, there is just no

11:23:39AM 17   way.

11:23:39AM 18            THE COURT:  Even if I assume all of that is true,

11:23:45AM 19   and it seems we are talking about complicated computer

11:23:52AM 20   programming software, and so forth, that took years to

11:23:56AM 21   develop, that doesn't answer the question about whether it

11:24:02AM 22   is preserved as trade secrets, what is open in the

11:24:06AM 23   industry, reverse-engineering, all sorts of other

11:24:09AM 24   potential defenses.

11:24:16AM 25        I want to hear, Mr. Whitaker, just briefly about the

11:24:19AM 1   discovery issue.  That may not be ripe, but if we are

11:24:25AM 2   going to proceed here, these things do need to be

11:24:29AM 3   disclosed.  There is a protective order in place.

11:24:32AM 4            MR. WHITAKER:  True, your Honor.  One at a time.

11:24:35AM 5   As to the experts, prior to the expert deadline, as it

11:24:38AM 6   existed in the past, we had lined up two experts who were

11:24:41AM 7   prepared to testify.  It is not that hard.  I can give you

11:24:44AM 8   their names.  We had two ready to testify.  Because we

11:24:47AM 9   didn't have the burden of proof, we just didn't.  The

11:24:51AM 10  discovery deadline came and went.

11:24:53AM 11       As to the production, it is unfair to say we were

11:24:59AM 12  supposed to produce anything.  They have asked for beta

11:25:01AM 13  software.  What we have told them is we will either make

11:25:04AM 14  it available for inspection in some certain instances or

11:25:08AM 15  we will provide it to an expert that you designate.  No

11:25:10AM 16  such expert has been designated.

11:25:12AM 17           The reason we are here, our TRO --

11:25:15AM 18           THE COURT:  Why do we limit it to just an expert?

11:25:19AM 19  In other words, they have internal expertise to evaluate

11:25:22AM 20  and analyze that.  I recognize that all of this generates

11:25:29AM 21  concern about trade secrets going back the other way, and

11:25:34AM 22  so forth.  That's why we have protective orders.  They are

11:25:38AM 23  not perfect, but that's how we proceed in litigation.

11:25:42AM 24           MR. WHITAKER:  True, your Honor.  If we'd

11:25:44AM 25  envisioned sort of an exchange of --  We would ask that a

11:25:47AM 1   very tailored protective order -- additional protect --

11:25:51AM 2   source code protective order be in place to deal with

11:25:54AM 3   exactly how that code is used and who can use it.  It is

11:25:56AM 4   more common to have tighter control over the exchange of

11:26:00AM 5   source code.

11:26:01AM 6        This unilateral concept, as we have demonstrated, and

11:26:05AM 7   it goes undisputed --  Syked Tuning software was in

11:26:08AM 8   existence years before this dispute arose, with no

11:26:11AM 9   allegation whatsoever that anything came from HP Tuners.

11:26:14AM 10  That's been --

11:26:14AM 11            THE COURT:  I understand.

11:26:15AM 12            MR. WHITAKER:  That has been around.  This fear,

11:26:17AM 13  that, "Oh, if Syked ECU Tuning sees HP Tuners code, that's

11:26:24AM 14  the end of the world," but, you know, they should have

11:26:26AM 15  unfettered access to everything he has done, that --  In

11:26:31AM 16  view of the purchase of confidential information from

11:26:34AM 17  anonymous sources, the judgment there that it will be

11:26:37AM 18  safeguarded -- that trade secrets will be safeguarded by

11:26:41AM 19  employees of HP Tuners is simply too great to justify that

11:26:45AM 20  manner of --

11:26:46AM 21            THE COURT:  All right.  I believe this case is

11:26:52AM 22  going to be advanced best by the appointment of an expert.

11:27:01AM 23  Expenses will be shared.  This is under Rule 706 of rules

11:27:07AM 24  of evidence.

11:27:08AM 25       What I am going to require the parties to do is to

11:27:13AM 1    meet and confer and see if you can agree upon an expert to

11:27:21AM 2    appoint, the scope of instructions, consulting 706 here.

11:27:35AM 3    I want to be optimistic that the parties can reach an

11:27:39AM 4    agreement with respect to the scope there.

11:27:42AM 5        I am really thinking about the source code and the

11:27:47AM 6    software.  That's where the key dispute is that would

11:27:54AM 7    benefit from an expert in the field.

11:27:59AM 8        I would imagine that this expert also would sort of

11:28:03AM 9    look like a special master, in the sense that the parties

11:28:07AM 10   will be able to advocate to the expert their position, and

11:28:11AM 11   so forth, so that the expert understands what the relative

11:28:15AM 12   positions are and can make an assessment.

11:28:21AM 13       If the parties are unable to agree on an expert, each

11:28:25AM 14   is to identify an expert from which -- with, of course, a

11:28:31AM 15   curriculum vitae.  And the court will appoint one or the

11:28:37AM 16   other.  I strongly encourage counsel to find someone that

11:28:43AM 17   they can agree upon.  I am not fond of having to appoint

11:28:50AM 18   one expert named by one person.  That's what it will have

11:28:54AM 19   to be if you are unable to reach an agreement.

11:28:59AM 20       The timeline for that, again, I think a week from

11:29:06AM 21   today should be sufficient for you to work out the

11:29:09AM 22   appointment and the designated scope of work.

11:29:18AM 23           MR. WHITAKER:  Your Honor, if I may?  My

11:29:21AM 24   sincerest apologies, but a week from today may be

11:29:24AM 25   difficult.  My daughter is getting married this weekend,

11:29:26AM 1    and I have a ton of family in town.  Could we have the

11:29:29AM 2    following Monday?

11:29:32AM 3                THE COURT:  Sure.  The following Monday.  And

11:29:37AM 4    then, of course, if you are unsuccessful in reaching an

11:29:40AM 5    agreed submission, then each party will make a proposal

11:29:44AM 6    for not only the expert but what the scope of that

11:29:48AM 7    expert's work should be.  That would be done at the same

11:29:58AM 8    time.  Given that, I am going to make it two weeks from

11:30:01AM 9    today.  I will give you another couple of days, because I

11:30:06AM 10   realize there is some work there.

11:30:08AM 11       And then the court will try to expeditiously, if

11:30:12AM 12   there is not an agreement, resolve as to who the expert

11:30:18AM 13   will be.  The cost will be borne equally by the parties.

11:30:25AM 14       The preliminary injunction hearing, we talked about

11:30:31AM 15   ten weeks --

11:30:34AM 16               MR. BLEIMAN:  Your Honor, may I be permitted?

          17               THE COURT:  Yes.

11:30:34AM 18               MR. BLEIMAN:  Your Honor, in light of the

11:30:38AM 19   concessions that the defendants made, and your order not

11:30:42AM 20   to prohibit the sales, perhaps Mr. Whitaker and I should

11:30:49AM 21   confer on this, because I don't really think the things

11:30:54AM 22   that are being ordered with relation to our IP and the

11:30:57AM 23   return of it and the non-use of it really would

11:31:00AM 24   necessitate --

11:31:03AM 25               THE COURT:  A preliminary injunction hearing.

11:31:06AM 1          MR. BLEIMAN:  I think that is probably an order

11:31:07AM 2     that can probably be in place --  It sounds like it's

11:31:14AM 3     agreed.  Maybe that is something that should be conferred

11:31:19AM 4     about.  Is that fair?

11:31:20AM 5          MR. WHITAKER:  Perhaps we should confer.  I am

11:31:24AM 6     not exactly sure what --  So we are going to appoint an

11:31:28AM 7     expert -- identify an expert to evaluate.  But then what?

11:31:32AM 8          THE COURT:  That's it.  It seems to me there will

11:31:36AM 9     be a product produced there.  I anticipated this

11:31:41AM 10    primarily, of course, in connection with anticipated

11:31:43AM 11    preliminary injunction on the source code issue.

11:31:52AM 12         MR. BLEIMAN:  That really just goes to the

11:31:54AM 13    overall merits of the whole case.  I mean, really, one of

11:31:59AM 14    the claims here relates to the source code.  So to have

11:32:05AM 15    two trials, potentially, on that issue, one in connection

11:32:08AM 16    with the preliminary injunction and one in connection with

11:32:11AM 17    the --

11:32:11AM 18         THE COURT:  That is your call to make.  It is

11:32:13AM 19    your motion.  If a preliminary injunction can be

11:32:20AM 20    avoided --  If that's the case, then I don't know that the

11:32:24AM 21    court needs to be appointing an expert to prepare for a

11:32:26AM 22    preliminary injunction.  That sort of obviates the need,

11:32:31AM 23    it seems to me.  If we are not going to have a preliminary

11:32:33AM 24    injunction, this is going to be the status of temporary

11:32:38AM 25    relief.

```
11:32:40AM  1              MR. BLEIMAN:  Can I confer with my client?

11:32:42AM  2              THE COURT:  Certainly.

11:33:07AM  3              MR. BLEIMAN:  I think what --  Mr. Whitaker made

11:33:15AM  4      a comment before, this beta version of the software that

11:33:18AM  5      we asked for, that they had said was going to be produced,

11:33:20AM  6      was a publicly-released version of the software.  It is

11:33:23AM  7      not something that is private.  I don't think it would

11:33:30AM  8      warrant any protective order -- source code protective

11:33:33AM  9      order or anything like that.  That's what we asked for in

11:33:36AM 10      discovery.  It hasn't been provided, this

11:33:39AM 11      publicly-released beta version.

11:33:42AM 12          I think with that publically-released --

11:33:42AM 13              THE COURT:  Well, that doesn't have a source

11:33:45AM 14      code --

11:33:48AM 15              MR. BLEIMAN:  But we can look at it to see -- to

11:33:50AM 16      make a determination in terms of the duplication or

11:33:53AM 17      incorporation of our source code into that beta version,

11:33:59AM 18      his software, if we can get a copy of that.  Again, this

11:34:04AM 19      isn't private.  It was publicly released.  We have asked

11:34:07AM 20      for it.  They had indicated they would produce it.

11:34:10AM 21              THE COURT:  It needs to be produced.

11:34:12AM 22              MR. WHITAKER:  If I may, your Honor?  The

11:34:14AM 23      statement that it was publicly released is flatly untrue.

11:34:19AM 24      It was not.  It was a beta version.  Beta, in the software

11:34:22AM 25      context, indicates that it is not a final version.
```

11:34:25AM 1    This particular version that they are discussing, the

11:34:27AM 2   entirety of their knowledge of it comes from one post on

11:34:30AM 3   Facebook, where Mr. Sykes-Bonnett said, "Hey, we have

11:34:34AM 4   another version we may be releasing."  It has not been

11:34:36AM 5   released.  It has never been released.  If it were

11:34:39AM 6   released to the public, they wouldn't have to ask us for

11:34:42AM 7   it.

11:34:42AM 8        THE COURT:  Even if that's so, it does need to be

11:34:45AM 9   produced.

11:34:45AM 10        MR. WHITAKER:  Again, your Honor, in the context

11:34:47AM 11   of some assurances that that information won't find its

11:34:51AM 12   way into the next version of HP Tuners' software.

11:34:54AM 13        THE COURT:  Again, this is what protective orders

11:34:56AM 14   are about.  You will have to craft one.  If you can't

11:34:58AM 15   agree on one, which I will be highly disappointed, the

11:35:03AM 16   court will have to take that up and craft a protective

11:35:09AM 17   order.  Those are legitimate concerns, but this happens in

11:35:13AM 18   intellectual property cases all the time.

11:35:16AM 19        MR. BLEIMAN:  The protective order is in place,

11:35:18AM 20   and it contemplates what's provided can be used solely in

11:35:21AM 21   connection with this litigation.  That's how we would use

11:35:25AM 22   it.

11:35:27AM 23    The public -- the first public release of their

11:35:30AM 24   software is what we want to see.  Again, I don't know that

11:35:34AM 25   there is these confidentiality concerns.  I understand

11:35:39AM 1   what we can use it for, and my client understands what it

11:35:43AM 2   can be used for and can't be used for.  But it is

11:35:46AM 3   something that can be produced.

11:35:47AM 4       Now, I think that we can -- if we can get that here

11:35:52AM 5   in a timely manner, and do that analysis, we may not need

11:35:56AM 6   to go forward with the preliminary injunction on that

11:36:01AM 7   issue.

11:36:02AM 8           THE COURT:  When is the trial date?

11:36:06AM 9           MR. BLEIMAN:  Currently, again, we have a pending

11:36:09AM 10  motion to modify the dates.  It is January 19th, I want to

11:36:13AM 11  say, of next year.

11:36:15AM 12          THE COURT:  And the time for designating experts

11:36:18AM 13  has passed under the current schedule?

11:36:20AM 14          MR. BLEIMAN:  Correct.

11:36:20AM 15          THE COURT:  And that is part of your

11:36:23AM 16  modification, right?

11:36:23AM 17          MR. BLEIMAN:  Correct.  As well as the discovery

11:36:27AM 18  disclosure and the dates.  Essentially we were --  Again,

11:36:31AM 19  the motion to compel and modify the schedule lays it out.

11:36:34AM 20  But there has been this cover up and concealment and

11:36:38AM 21  misdirection throughout this entire case.  We got this

11:36:41AM 22  information on August 5th, and now we want the discovery

11:36:45AM 23  we have asked for.  We want to be able to take the

11:36:48AM 24  depositions of --

11:36:50AM 25          THE COURT:  So if the court extends and modifies

11:36:53AM 1   the deadline for identification of experts, and maybe that

11:36:57AM 2   implicates a trial continuance --

11:37:01AM 3          MR. BLEIMAN:  Correct.

11:37:01AM 4          THE COURT:  -- then it would seem that the

11:37:05AM 5   appointment of an expert by the court would be

11:37:10AM 6   unnecessary, because we are not going to have a

11:37:12AM 7   preliminary injunction hearing, we are going to move

11:37:14AM 8   straight to the trial.

11:37:16AM 9          MR. BLEIMAN:  Correct.

11:37:17AM 10          THE COURT:  Mr. Whitaker, I think that is the way

11:37:19AM 11   we should proceed.

11:37:20AM 12          MR. WHITAKER:  Certainly, your Honor.  We would

11:37:22AM 13   ask that the court entertain a motion for an additional

11:37:26AM 14   protective order directed directly at certain software.

11:37:31AM 15   What they have asked for isn't ready for release.  There

11:37:35AM 16   are a lot of problems with turning it over to any employee

11:37:38AM 17   of HP Tuners.  In connection with that request, since it

11:37:45AM 18   is effectively brand new, that's the relief we would ask

11:37:49AM 19   for.  I can fashion a motion --

11:37:53AM 20          THE COURT:  You can make a motion for a

11:37:54AM 21   protective order.  What I'm saying --  The court is moving

11:37:58AM 22   toward granting a motion to compel the production of this

11:38:02AM 23   software.  And I believe, in the interest of justice, if

11:38:13AM 24   this case is going to get a fair hearing, the schedule is

11:38:18AM 25   going to have to be continued in order to have the parties

11:38:21AM 1   have experts analyze this software.

11:38:27AM 2         MR. WHITAKER:  Yes, your Honor.

11:38:32AM 3         THE COURT:  So no appointed expert.  There will

11:38:35AM 4   be a motion if the parties haven't been able to agree on

11:38:41AM 5   an ordinarily tailored protective order in connection with

11:38:44AM 6   this particular disclosure.  Failing that, there will be a

11:38:48AM 7   motion filed for the court to resolve it.  We will

11:38:56AM 8   probably do that over a telephone conference if it is

11:38:59AM 9   disputed.  The parties, otherwise, are going to work

11:39:06AM 10  toward the order that I talked about.

11:39:12AM 11        MR. BLEIMAN:  Okay.  As far as --  I mean, the

11:39:16AM 12  other pending motions, they have time to respond to them.

11:39:21AM 13        THE COURT:  They do.  Again, I think this is an

11:39:23AM 14  area --  Let's have agreement.  Let's not have to have the

11:39:27AM 15  court resolve it.  I have already communicated to you

11:39:34AM 16  where the court is likely headed on this.  It is much

11:39:38AM 17  better if the parties sit down and agree than leave it to

11:39:42AM 18  the court.  I think I have telegraphed to you where I

11:39:48AM 19  think this is likely to go anyway.

11:39:51AM 20        MR. BLEIMAN:  Understood.  In terms of the

11:39:52AM 21  scheduling order, would you like us to submit a new

11:39:54AM 22  proposed scheduling order to the court?

11:39:57AM 23        THE COURT:  Yes.  If the January date doesn't

11:40:02AM 24  work because of the dispositive motion deadline, expert --

11:40:12AM 25  In other words, even if we extended the expert deadline

11:40:14AM  1    now, it seems to me the other deadlines wouldn't work.  I

11:40:19AM  2    think we are looking at a continuation of the trial date.

11:40:21AM  3    I don't think it has to be long.

11:40:26AM  4            MR. BLEIMAN:  I think I put in the motion three

11:40:30AM  5    or four months.  I can't remember exactly.  But I think

11:40:33AM  6    maybe May I put -- sometime in May.

11:40:38AM  7            THE COURT:  That might be able to be agreed to,

11:40:40AM  8    earlier.  A couple of months --  Sometime in March --

11:40:45AM  9            MR. BLEIMAN:  I tried to move all of the dates

11:40:47AM 10    back accordingly.  We can revisit that.

11:40:50AM 11            THE COURT:  All right.  I will hope to see an

11:40:57AM 12    agreed order on amended scheduling order.  Again, failing

11:41:02AM 13    agreement, then the parties will submit --

11:41:05AM 14            MR. WHITAKER:  I have the court's intent on the

11:41:08AM 15    pending motion to compel all of this software and other

11:41:12AM 16    documents on the defendants' behalf.  There is another

11:41:16AM 17    pending motion where we have requested some documents in

11:41:19AM 18    connection with an arbitration that simply haven't been

11:41:21AM 19    produced.  It is unrelated.  It is essentially a lot of

11:41:24AM 20    communications pertaining to someone else named Matt

11:41:27AM 21    Honeycutt, the first person sued in connection with all of

11:41:30AM 22    these disputes.  We are hopeful that that motion can stay

11:41:33AM 23    on the calendar for consideration.

11:41:35AM 24            THE COURT:  It is.  I haven't really looked at

11:41:37AM 25    it.  It can remain.

11:41:45AM 1          I think we have exhausted the better part of two

11:41:50AM 2     hours here.   It has been a good hearing.   I encourage

11:41:55AM 3     cooperation.

11:41:56AM 4          Having recently married off a daughter, the fourth

11:42:01AM 5     one, I wish you well.

11:42:04AM 6               MR. WHITAKER:   Thank you, your Honor.

7                    (Proceedings concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3

4        I, Barry Fanning, Official Court Reporter for the

5    United States District Court, Western District of

6    Washington, certify that the foregoing is a true and

7    correct transcript from the record of proceedings in the

8    above-entitled matter.

9

10

11

12    _____

     **/s/ Barry Fanning**
13    **Barry Fanning, Court Reporter**

14

15

16

17

18

19

20

21

22

23

24

25