HONORABLE BENJAMIN H. SETTLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | | |
|---|---|---|
| HP TUNERS, LLC, a Nevada limited liability company, | ) ) ) | CASE NO.  3:17-cv-05760-BHS |
| Plaintiff, | ) ) | **PLAINTIFF HP TUNERS LLC'S TRIAL BRIEF** |
| vs. | ) ) | |
| KEVIN   SYKES-BONNETT   and   SYKED ECU   TUNING   INCORPORATED, Washington   corporation,   and   JOHN MARTINSON, | ) ) ) ) | |
| Defendants. | | |

## PLAINTIFF'S TRIAL BRIEF

NOW COMES, Plaintiff HP Tuners, LLC ("HPT" or "Plaintiff"), by its attorneys, for its Trial Brief, HPT states as follows:

## I.      INTRODUCTION

This is a suit for misappropriation of confidential proprietary information, including trade secrets, and related causes of action for violations of federal and state law, unfair competition, breach of contract and tortious interference with prospective economic relations. The case is scheduled for jury trial on October 29, 2019. This brief sets forth the facts of the case, the law with respect to liability, the law with respect to damages, the law with respect to costs, the law with respect to fees, and Plaintiff's contentions with respect to each such item.

PLAINTIFF'S TRIAL BRIEF - page 1

## II.   <u>ADMITTED MISCONDUCT AND REMAINING ISSUES IN DISPUTE</u>

On September 20, 2017, Plaintiff initiated litigation against Defendants claiming that Defendants misappropriated HPT's proprietary software, systems and source code, reverse engineered the software, release cracked versions of HPT's software, unlawfully sold thousands of credits for use in HPT's software, created and sold fraudulent application keys to unlock HPT's software, and publicly disclosed HPT's confidential information.  Dkt. 35, ¶¶ 56-81.

After extensive discovery, Defendants now admit to the possession of HPT's confidential and proprietary information, Defendants admit to hacking and publicly releasing cracked versions of HPT's software and Defendants admit to generating and selling fraudulent application keys to third parties for profit.

Regarding these issues, in pleadings filed by Defendant in this matter (see Dkt. 209), Defendant Kevin Sykes-Bonnett ("Sykes-Bonnett") conceded liability for "having generated and distributed unauthorized 'keys' permitting others to use HP Tuners tuning products without paying the license fees HP Tuners charges for such use." (Dkt. 202, p. 1).  "Mr. Sykes-Bonnett (1) does not deny these allegations, (2) has stipulated and admitted that he engaged in this activity, and (3) accepts liability for having done so."  (Dkt. 202, p. 1).  The admissions to this misconduct give rise to liability under each of the counts asserted in the First Amended Complaint.

Similarly, Defendant Sykes-Bonnett conceded liability for "having 'hacked' certain HP Tuners' software and posting that hacked software to the Internet under the username, 'ecumaster.'"  (Dkt. 202, p. 2).  "Mr. Sykes-Bonnett (1) does not deny these allegations, (2) has stipulated and admitted that he engaged in this activity, and (3) accepts liability for having done

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

so." (Dkt. 202, p. 2).  The admissions to this misconduct give rise to liability under each of the counts asserted in the First Amended Complaint. (Dkt. 35).

However, Defendants' misconduct goes beyond these issues.  With regard to HPT's claims sounding in trade secret misappropriation, Defendants admit to receiving and possessing HPT's VCM Suite Software, source code, key generator and MPVI communication protocol documents.  Likewise, Defendants have admitted to the dissemination of HPT's source code to a third-party which also gives rise to liability for the claims asserted.  Therefore, on these issues, liability has been admitted and the only determination for the jury in connection with these issues are damages to be awarded to HPT for such misconduct on each of the claims asserted.

At this time, the only claim disputed by the Defendants in this case centers on the alleged further misappropriation of HPT's trade secrets and intellectual property by Defendants in connection with the creation and development of Defendants' software.  At trial, the documentary and testimonial evidence will show that HPT's source code, VCM Suite Software, HPT's parameters list, HPT's implementation of algorithms, HPT's key generator, HPT's MPVI communication protocol documents and various HPT files, programs, documents, materials and information contained on the Flash Drive (which Sykes-Bonnett destroyed in the midst of these proceedings) constitute trade secrets of HPT.  Here, the evidence will demonstrate and establish: that some of HPT's intellectual property is present in Defendants' source code; some of the source code present on different versions of the Defendants' software products is extremely similar or identical to source code from HPT's software product; and, Defendants' software tools were able to handle HPT's hardware, which would require Defendants to use HPT's communication protocols, and having access to HPT's source code provided Defendants with, among other things, proven working strategies, a performance baseline, suggestions on how to

PLAINTIFF'S TRIAL BRIEF - page 3

address problems, access to algorithms or vehicle manufacturer data, etc., that could have saved Defendants a significant amount of research and development time and resources that would have been required to achieve a product in its current form.  Consequently, the evidence will also show that Defendants misappropriated HPT's trade secrets in connection with the development of Defendants' products giving rise to Defendants' liability for the trade secret misappropriation (and unfair competition) claims asserted in the First Amended Complaint.

### III.   FACTS

1. At substantial expense, hard work and ingenuity over the course of many years and thousands of man hours, HPT has developed complete, cost effective tuning and data acquisition solutions for automobile enthusiasts and professional shops.

2. Over the years, HPT has carefully guarded its proprietary products and source code in order to protect its trade secrets, specifications and software.

3. HPT is a Nevada limited liability company with its principal place of business in Buffalo Grove, Illinois.

4. Sykes-Bonnett is a resident of Washington and is the President of Syked ECU Tuning Incorporated ("Syked Tuning").

5. John Martinson is a resident of Washington and an officer of Syked Tuning .

6. Syked  Tuning  is a corporation existing under the laws of Washington with its principal places of business in Puyallup, Washington.

7. HPT is a niche business, which provides complete, cost effective automotive tuning and data acquisition solutions for enthusiasts and professional shops.

8. HPT's business includes but is not limited to computer hardware and software designed for use in custom and/or pre-programmed engine and transmission tuning and

PLAINTIFF'S TRIAL BRIEF - page 4

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

calibration applications for automobiles, trucks and other types of vehicles (including but not limited to ATVs, snowmobiles and watercraft) (the "HP Tuners Business").

9.      HPT has expended significant time, money and resources to develop the HP Tuners Business, and HPT has created methods of business, strategies, programs and technologies which did not exist in the industry prior to HPT's development of the HP Tuners Business.

10.      HPT conducts business nationwide and internationally.

11.      Over the years, HPT has invested a great deal of time and money in developing its proprietary products and source code, and in building and growing the HP Tuners Business.

12.      For HPT to gain a competitive advantage in the industry, it has cultivated, nurtured and maintained an extensive network of vendors, resellers and customers to which HPT provides its products and offerings.

13.      HPT's network of vendors, resellers and customers is expansive and relies on HPT to ensure that only authorized, authentic products and offerings are available in the marketplace.

14.      HPT invests a substantial amount of money and other resources in developing and maintaining its network of vendors, reseller and customers.

15.      HPT prides itself in catering to the needs of its vendors, resellers and customers and providing authorized, authentic and functional products and offerings, and the most competitive pricing in the industry.

16.      HPT works diligently to create new products and offerings and to quickly and adeptly match its vendors, resellers and customers' needs and requests.

17.      HPT is constantly working to develop its products, source code and offerings, and

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

has devoted substantial time, money and resources to protect its confidential and proprietary information, and to avoid efforts by third parties to pirate HPT's products and offerings.

18.     As a result of HPT's reputation, exceptional service, and diligent development of products and offerings, HPT has developed long-standing relationships with many of its vendors, resellers and customers.

19.     HPT's confidential and proprietary software, source code, license key generator, implementation of various algorithms and MPVI communication protocol documents and offerings have been developed and extensively refined by HPT at a substantial cost and effort and constitute confidential information and valuable trade secrets of HPT (collectively, the "Confidential Information").

20.     HPT derives economic value from the fact that its Confidential Information is not known outside of HPT's business and is not available through any public records and information sources. HPT's Confidential Information cannot be independently developed by its competitors without great effort and expense.

21.     In addition to HPT's VCM Suite Software, the valuable trade secrets of HPT include, but are not limited to the following:

   a.  Parameters List – The Parameters List (specifically its E38 parameters) contains pairs of names (of parameters) and an associated value for each name.  HPT has created names for the parameters that are readily understandable and usable by a user.  HPT's Parameter List is critical to making its product user friendly to its customers as they modify/tune their vehicles.  The Parameters List is confidential, proprietary and trade secret intellectual property of HPT.

   b.  Source Code – While certain executable files are made available to HPT

PLAINTIFF'S TRIAL BRIEF - page 6

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

customers, the source code that creates those executable files as well as the source code that drives the HPT interfaces and the software residing on HPT's systems is proprietary and fundamental to HPT's business. By analyzing the source code one can understand the details regarding how HPT's software functions and how it could potentially be modified or replicated/mimicked. HPT's source code is confidential, proprietary and trade secret intellectual property of HPT. Defendants possessed HPT's source code specifically including but not limited to HPT's VCM Suite software source code for version 2.23 and the source code for HPT's MPVI firmware.

c.   <u>MPVI Communication Protocol</u> – HPT developed its own communication protocol that enables the VCM Editor software (downloaded from HPT's website) to communicate to the HPT interface (e.g. the MPVI) and the firmware contained therein to communicate with the vehicle. The interface and vehicle utilize different means of communicating and the protocol enables the two to communicate despite this difference. This communication protocol is confidential, proprietary and trade secret intellectual property of HPT.

d.   <u>Communication Algorithms</u> – Through the commitment of significant time, effort and cost, HPT was able to determine certain communication algorithms that are necessary to initiate communication between various automobile's computers and an external interface (like the HPT interfaces known, for example, as an MPVI) through which one could communicate to those computers. These algorithms are akin to an "electronic handshake" that is required by an automobile's computer for any further communication to occur. The specific implementation of these

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

algorithms is confidential, proprietary and trade secret intellectual property of HPT.

    e.   <u>Application Key Generator</u> – Among the software residing on HPT's servers is an application key generator.  When a customer wishes to add credits to their interface (to license more vehicles), they purchase credits from HPT's website specifically for their interface.  Credits are delivered to the customer via an application key that is created and sent from the application key generator.  The application key is a 35-character string, which includes a variety of secure information including the interface ID and the total credit quantities purchased to date.  The application key utilizes secure validation measures to prevent fraudulent reproduction.  The application key generator is confidential, proprietary and trade secret intellectual property of HPT.

22.   Recognizing the economic value that it derives from its Confidential Information, as well as the potential value of this information to its competitors, HPT requires that its Confidential Information be kept strictly confidential by its employees and restricts access to this information.  HPT has taken substantial steps and security measures to protect the confidentiality of its Confidential Information, including but not limited to the following:

    a.   HPT protects access to its Confidential Information through computer passwords;

    b.   HPT protects to its Confidential Information through hard drive encryption on all employee's computers;

    c.   HPT protects access to its Confidential Information through sophisticated firewalls;

    d.   HPT protects distribution of Confidential Information through non-compete and

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

non-disclosure agreements;

e.  HPT limits the number of employees having access to its Confidential Information;

f.  Employees are given access to HPT's Confidential Information on a "need to know" basis;

g.  HPT does not give access to its Confidential Information to non-employees;

h.  HPT employees are forbidden from copying, transferring or otherwise duplicating any of HPT's Confidential Information; and

i.  HPT requires each employee to return to HPT all Confidential Information when the employee leaves HPT's employ.

23.  Furthermore, HPT undertook reasonable measures to maintain the secrecy of its proprietary products, source code, software and offerings, including but not limited to entering into licensing agreements with protective clauses and installing security measures to prevent others from obtaining access and pirating HPT's confidential and proprietary products, source code, software and offerings.

24.  In connection with the Defendants' use of HPT's software, Defendants entered into an End User License Agreement ("EULA") with HPT.

25.  The EULA provided, in pertinent part:

> You may not create a derivative work, reverse engineer, decompile, or disassemble the SOFTWARE PRODUCT, except and only to the extent that such activity is expressly permitted by applicable law notwithstanding this limitation.

26.  The EULA also limits the user's right to transfer the software.  Specifically, it states:

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

> You may physically transfer the SOFTWARE PRODUCT from one of your computers to another provided that the SOFTWARE PRODUCT is used on only one computer at a time. You may not distribute copies of the SOFTWARE PRODUCT or accompanying written materials to others. You may not transfer the SOFTWARE PRODUCT to anyone without the prior written consent of HP Tuners LLC.

27.     Sykes-Bonnett and others acting in concert with him reversed engineered HPT's software.

28.     Sykes-Bonnett and others acting in concert with him decompiled, disassembled and hacked HPT's software.

29.     Sykes-Bonnett possessed HPT's confidential and proprietary source code.

30.     Sykes-Bonnett accessed HPT's confidential and proprietary source code.

31.     Sykes-Bonnett shared HPT's confidential and proprietary source code with third parties.

32.     Sykes-Bonnett possessed HPT's confidential and proprietary parameters list.

33.     Sykes-Bonnett accessed HPT's confidential and proprietary parameters list.

34.     Sykes-Bonnett, individually and as an owner and officer of Defendant Syked Tuning , and others acting in concert with him incorporated HPT's confidential and proprietary parameters list into Syked  Tuning's software.

35.     Sykes-Bonnett received the subject Flash Drive through unauthorized means containing HPT's confidential and proprietary information.

36.     Sykes-Bonnett accessed and used the Flash Drive containing HPT's confidential and proprietary information.

37.     Sykes-Bonnett accessed and used HPT's confidential and proprietary trade secret information, including source code, program files and other materials on the Flash Drive

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

containing HPT's confidential and proprietary information in connection with the development of Defendants' software.

38.     Sykes-Bonnett received HPT's confidential and proprietary key generator tool through unauthorized means.

39.     Sykes-Bonnett possessed HPT's confidential and proprietary key generator tool.

40.     Sykes-Bonnett accessed and used HPT's confidential and proprietary key generator tool.

41.     Sykes-Bonnett generated application keys for use with HPT interfaces for third parties for profit.

42.     On June 24, 2017, Sykes-Bonnett operating under the username "ecumaster" on mhhauto.com posted with the intent to help with generating licenses for HPT software and publicly stated, "I can help you with credits for cheap."

43.     On June 28, 2017, on the HPT forum, Sykes-Bonnett operating under the username "ecumaster" advertised "Hacked Credits" for HPT's VCM Suite software.  The post stated: "No Dramas or Hassles cheap credits.  Only $25aud each, 8 for $100aud or 20 for $200aud.  discounthptunercredits@mail.com Cheers".

44.     On July 6, 2017, on the HPT forum, Sykes-Bonnett operating under the username "crackedyou" advertised "cracked" software and licenses.  The post stated as follows:

Cracked 2.24

So we have successfully cracked and patched HPTuner VCM software to never ask for licenses.  You can read, write and edit/save most all 1998-2014 GM cars and some early Ford to about 2010 and Dodge stuff they supported.  Email discounthptunercredits@mail.com if you are interested in this version.  The 3.4 and 3.5

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

has [sic] been patched already and is [sic] in testing and then we will crack 3.6 and remove the call back to the server.

You can read, save, edit and flash any supported files without EVER being asked to license.  You can use your existing cable or a brand new one and new [sic] use another credit again.

Cheers

45.    Sykes-Bonnett released and made hacked HPT software publicly available for download by third parties on the internet under the username "ecumaster", among other aliases.

46.    The significance of the "cracked" software advertised by crackedyou and ecumaster is that it allows users to bypass all licensing checks and prompts, thus enabling HPT's users to use the software on any vehicle they wish without paying any licensing fees to HPT.

47.    HPT did not authorize crackedyou, ecumaster or any others to modify HPT's software to bypass all licensing checks and prompts to obtain "free" tuning credits from HPT.

48.    On July 6, 2017, HPT contacts discounthptunercredits@mail.com via alias Peter Brodski and purchases four (4) discounted Dodge credits.

49.    HPT receives the credits and verifies that it correctly generates the license keys.

50.    On July 14, 2017, Sykes-Bonnett operating under the username discounthptunercredits@mail.com emailed select HPT employees (including an employee whose association with HPT is not publicly known to anyone besides this employee's family, current HPT employees and former HPT employees) containing a link to a "cracked" version of HPT's VCM Suite Software version 3.4.  The email contends that discounthptunercredits@mail.com has "patched" versions 3.5 and 3.6 of HPT's VCM Suite Software as well.

51.    On August 21, 2017, Sykes-Bonnett operating under the username

PLAINTIFF'S TRIAL BRIEF - page 12

discounthptunercredits@mail.com emailed select HPT employees demanding a public apology from HPT.

52.     Specifically, on August 21, 2017 at 1:05 p.m., various HPT personnel received an email from Sykes-Bonnett operating under the username discounthptunercredits@mail.com demanding a public apology from HPT and in which Sykes-Bonnett threatened the public release of a cracked version of HPT's VCM Suite Software 3.6, its newest release.

53.     The email stated:

> Still waiting for the apology for fucking everyone when you shut down the open
>
> source.  Here is a fully cracked 3.6 with no licensing required EVER.  Don't make me
>
> release this.  You have until the end of the week.

54.     Sykes-Bonnett has worked with others, including but not limited to Defendants and Christopher Breton-Jean to reverse engineer, disassemble, decompile and remove licensing from HPT's VCM Suite Software and to distribute it publicly for their own profit.

55.     In fact, documentation received from PayPal in connection with the discounthptunercredits@mail.com email which was used as an alias by Sykes-Bonnett (which was collecting money for the discounted credits that were being offered for sale) demonstrates that funds were paid by discounthptunercredits@mail.com to Christopher Breton-Jean.

56.     A fundamental component of the HP Tuners Business is the sale and distribution of credits via application keys, which are the license mechanism used by customers to tune vehicles.

57.     Only HPT is authorized to generate authentic application keys for use with HPT's products and HPT credits are generally sold for approximately $50.00 USD.

58.     Sykes-Bonnett has knowingly generated, created, used and/or obtained fraudulent

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

application keys that were not generated by HPT.

59.     Sykes-Bonnett, acting in concert with others, have wrongfully acquired and possess an HPT license generator tool, which they have used to generate and sell licenses publicly that have been passed off as genuine and authentic products and offerings of HPT.

60.     Sykes-Bonnett, acting in concert with others, have wrongfully accessed, trespassed, engineered and/or hacked HPT's software, systems and source code to remove licensing restrictions from HPT's VCM Suite Software to distribute it for their own profit as well as to cause harm to HPT.

61.     Sykes-Bonnett, acting in concert with others, have publicly posted confidential and proprietary information of HPT including screenshots of HPT's parameter lists and which have been incorporated into Syked Tuning's software.

62.     Sykes-Bonnett's generation and/or use of fraudulent application keys to obtain credits without purchasing them from HPT constitutes a violation of the terms and provisions of the EULA, otherwise infringes upon HPT intellectual property rights and constitutes a misappropriation of HPT's confidential and proprietary information.

63.     Sykes-Bonnett, acting in concert with others, have knowingly and wrongfully acquired, possess and are using fraudulent application keys to generate licenses, tune vehicles and generate revenues for their own benefit or the benefit of others.

64.     Defendants had possession of and access to HPT's confidential and proprietary trade secrets, including HPT's source code, HPT's VCM Suite Software, HPT's key generator tool, HPT's implementation of various algorithms, HPT's MPVI communication protocol documents, HPT's parameters list and various HPT files, programs, documents, materials and information on a Flash Drive which Sykes-Bonnett destroyed in the midst of these proceedings.

PLAINTIFF'S TRIAL BRIEF - page 14

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

65.     Sykes-Bonnett, on behalf of himself and Syked Tuning, shared HPT's confidential and proprietary information with one or more third parties, including Christopher Breton-Jean, and Defendants Sykes-Bonnett and Syked Tuning paid Breton-Jean for his services.

66.     Syked Tuning, Inc. engaged Christopher Breton-Jean as an independent contractor to assist with the development of Syked Tuning's software.

67.     Sykes-Bonnett, on behalf of Syked Tuning, disclosed HPT's source code to third parties via electronic means.

68.     Sykes-Bonnett, on behalf of Syked Tuning, disclosed HPT's source code to Christopher Breton-Jean's work for Syked Tuning.

69.     Sykes-Bonnett, on behalf of Syked Tuning, shared HPT's confidential and proprietary files with third parties via electronic means.

70.     Sykes-Bonnett generated application keys for third parties using HPT's confidential and proprietary key generator.

71.     Sykes-Bonnett destroyed the Flash Drive containing HPT's confidential and proprietary information with a hammer during the course of these proceedings.

72.     Dr. Ernesto Staroswiecki, Ph. D., P.E., HPT's disclosed expert, analyzed various discovery information and Defendants' source code in connection with this matter.   Dr. Staroswiecki prepared a report in connection with this matter.

73.     Dr. Staroswiecki's opinions included but were not limited to the following:

    a.   Some of HPT's intellectual property is present in Defendants' source code.

    b.   Defendants provided application keys to third parties and shared source code with third parties that is identical to that present in HPT's software products.

    c.   Some of the source code present on different versions of the Defendants' software

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

products is extremely similar or identical to source code from HPT's software product.

    d. Defendants' software tools were able to handle HPT's hardware, which would require Defendants to use HPT's communication protocols.

    e. Having access to HPT's source code could have provided Defendants with, among other things, proven working strategies, a performance baseline, suggestions on how to address problems, access to algorithm or vehicle manufacturer data, etc., that could have saved Defendants a significant amount of research and development time and resources that would have been required to achieve a product in its current form.

    f. As detailed in the Expert Report, Defendants' actions hampered Dr. Staroswiecki's work.

74. John R. Bone, CPA, CFF, HPT's damages expert, analyzed various pleadings and discovery information and has rendered the following opinions in this matter.

75. Based on Mr. Bone's report, HPT asserts that:

    a. Damages adequate to compensate HPT for the fraudulent credits sold by Defendants amount to at least $190,000 (one hundred ninety thousand dollars).

    b. Unjust enrichment damages adequate to compensate HPT for Defendants' use and misappropriation of HPT's Parameters list, source code, communications protocol and communications algorithms to enable the development of or accelerate the development of Defendants' tuning software are $4,100,000 (four million one hundred thousand dollars).

    c. Unjust enrichment damages adequate to compensate HPT for misappropriation of

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

HPT's Parameters List are $5,700 (five thousand seven hundred dollars).

d.  Unjust enrichment damages adequate to compensate HPT for misappropriation of HPT's source code are $4,100,000 (four million one hundred thousand dollars).

e.  Unjust enrichment damages adequate to compensate HPT for misappropriation of HPT's communication protocol are $19,000 (nineteen thousand dollars).

f.  Unjust enrichment damages adequate to compensate HPT for misappropriation of HPT's communication algorithms are $32,000 (thirty-two thousand dollars).

g.  Damages adequate to compensate HPT for lost profits as a result of the distribution of cracked HPT software are $8,700,000 (eight million seven hundred thousand dollars).

76.  HPT has suffered irreparable harm as a result of Defendants' misconduct. Consequently, permanent injunctive relief is appropriate in this matter.

77.  An award of prejudgment interest and attorneys' fees in HPT's favor and against Defendants is warranted in this matter.

78.  HPT's First Amended Complaint asserts the following causes of action:

a.  Count I for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §1030;

b.  Count II for violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1836 et seq.;

c.  Count III for misappropriation of trade secrets arising under the Washington Uniform Trade Secrets Act, RCW 19.108;

d.  Count IV for violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 et. seq.;

e.  Count V for unfair competition under the Washington Consumer Protection Act,

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

RCW 19.86.020;

   f.   Count VI for unfair competition under the Illinois Consumer Fraud and Deceptive

        Business Practices Act, 815 ILCS 505/1 et. seq.;

   g.   Count VII for breach of contract; and,

   h.   Count VIII for tortious interference with prospective economic relations.

## IV.   LAW AND CONTENTIONS REGARDING LIABILITY

Plaintiff has the burden of proving each of its claims by a preponderance of the evidence. 2 MCCORMICK ON EVIDENCE, The Burdens of Proof and Presumptions § 337 (7th ed.). Plaintiff is not required, however, to present direct evidence as to each of those claims. 2 MCCORMICK ON EVIDENCE, supra, at § 338. The jury may draw inferences based on the evidence presented. 2 MCCORMICK ON EVIDENCE, supra, at § 342. The "burden of showing something by a 'preponderance of the evidence' . . . 'simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence'." *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 622 (1993)(citation omitted)(alteration in original).

### A.   Claim for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §1030

The CFAA was enacted in 1984 as a criminal statute to protect classified information in government computer systems. A private right of action (18 U.S.C. § 1030(g)), providing both compensatory damages and injunctive relief was added in 1994. In 1996 the CFAA was amended to include computers "which [are] used in interstate or foreign commerce or communications" by defining such computers as "protected" computers.  The CFAA applies

PLAINTIFF'S TRIAL BRIEF - page 18

whether information qualifies as a secret or not, from the taking and/or use of same by hackers, spammers and others.

The prima facie elements of a CFAA under § 1030(a)(2) claim are: (1) intentionally access a computer (2) "without authorization" or that "exceeds authorized access," (3) from a protected computer, (4) committed for commercial advantage or private financial gain or committed in furtherance of any commercial or tortious act or the value of the information obtained exceeds $5,000.

The CFAA defines "exceeds authorized access," as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled to so obtain or alter." *See* 18 U.S.C. § 1030(e)(6). To prove that one has "exceeded authorized access," a plaintiff may show (a) how the person's authority to obtain or alter information on the computer was limited, rather than absolute, and (b) how the person exceeded the limitations in obtaining or altering the information.

Here, Defendants' misconduct constitutes violations of the CFAA. Sykes-Bonnett, individually and as an owner an officer of Defendant Syked Tuning, and in concert with others, knowingly and with intent to defraud, wrongfully accessed, trespassed, engineered and/or hacked HPT's software, systems and source code to remove licensing restrictions from HPT's VCM Suite Software which has a value far in excess of $5,000 and publicly distributed it to cause harm to HPT, which is a competitor of Syked Tuning.  Defendants, acting in concert with others, accomplished this via various means including adding extra licenses to existing interfaces and reselling them, by logging in via remote desktop to customer machines to enter in a hacked license key and by selling a version of hacked software with licensing defeated.  HPT's business, computers, software, systems and source code are used in, and affect, interstate commerce.

PLAINTIFF'S TRIAL BRIEF - page 19

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

The evidence will show that Defendant Sykes-Bonnett, individually and as an owner an officer of Defendant Syked Tuning, has admitted to *intentionally* hacking and publicly releasing HPT's software to allow third parties to use HPT's software without having to purchase application keys from HPT.  Defendants (including Defendant Sykes-Bonnett and Defendant Syked Tuning, by virtue of its principals and independent contractors it engaged to provide services) have admitted to *intentionally* reverse engineering, decompiling, disassembling and otherwise hacking HPT's software.   Furthermore, Sykes-Bonnett has also admitted to *intentionally* distributing fraudulent application keys to third parties for profit.  As a result of the intentional misconduct (which has been admitted), HPT will be entitled to a verdict in its favor for violation of the CFAA in the form of monetary damages and for permanent injunctive relief.

**B.**    **Claim for violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1836 et seq.**

The Defend Trade Secrets Act is a federal statute which prohibits the theft of trade secrets. 18 U.S.C.A. § 1832. The purpose of the statute is to "give American companies the opportunity to protect against and remedy misappropriation of important proprietary information." B. Cohen, M. Renaud & N. Armington, *Explaining the Defend Trade Secrets Act,* BUSINESS LAW TODAY (Sept. 2016).

To prevail on a claim for violation of the Defend Trade Secrets Act, Plaintiff must prove: (1) the existence of a trade secret that is related to a product or service used in, or intended for use in, interstate commerce; (2) ownership of the trade secret by Plaintiff; and (3) an actual or threatened misappropriation of the trade secret. 18 U.S.C. § 1836.

A trade secret consists of information as to which the owner has taken reasonable measures to keep secret and derives actual or potential value from not being generally known to

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

or readily ascertainable by the general public. 18 U.S.C. § 1839(3). A trade secret may include financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs or codes. 18 U.S.C. § 1839(3). Trade secret information may consist of information that is stored or recorded physically, electronically, graphically, photographically or in writing. 18 U.S.C. § 1839(3).

The "owner" of a trade secret is the person or entity in whom or in which rightful legal or equitable ownership resides. 18 U.S.C. § 1839(4).

The term "misappropriation" means: (1) acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret by a person who used improper means to acquire knowledge of the trade secret; or (3) disclosure or use of a trade secret by a person who knew or had reason to know at the time of disclosure or use that the trade secret was derived through a person who had used improper means to acquire the trade secret; or (4) disclosure or use of a trade secret by a person who acquired the trade secret under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (5) disclosure or use of a trade secret by a person who derived the trade secret through a person who owed a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (6) disclosure or use of a trade secret by a person who before a material change of his or her position knew or had reason to know that it was a trade secret, and that knowledge of it had been acquired by accident or mistake. 18 U.S.C. § 1839(5).

The term "improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

means, but does not include reverse engineering, independent derivation or any other lawful means of acquisition. 18 U.S.C. § 1839(6).

Here, the evidence will show that: (1) Defendants had access to HPT's trade secrets, including the HPT's source code, parameters' list, key generator, implementation of various algorithms, MPVI communication protocol documents and various HPT files, programs, documents, materials and information on a Flash Drive (which Sykes-Bonnett destroyed); (2) HPT's trade secrets are not generally known to, or readily ascertainable by, the general public or its competitors; (3) HPT's trade secrets have independent value, both actual and potential, from not being generally known, and not readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure and use; (4) HPT undertook significant efforts to maintain the confidential nature of its trade secrets; (5) Defendants misappropriated HPT's trade secrets without HPT's knowledge or consent; (6) Defendants' misappropriation of HPT's trade secrets was willful and malicious; (7) Defendants used, and may be continuing to use, HPT's trade secrets to benefit themselves/itself to the detriment of HPT; and (8) as a result of Defendants' misappropriation of trade secrets, HPT has suffered and will continue to suffer damages.  Moreover, by virtue of the order in connection with Plaintiff's Motion for Sanctions for Spoliation of Evidence, Plaintiff is entitled to adverse inferences applicable to all Defendants concerning the evidence on the Flash Drive which was destroyed and jury instructions on this issue giving rise to liability for the claims asserted.  Thus, HPT will be entitled to a verdict in its favor on the claim for violation of the Defend Trade Secrets Act in the form of damages and permanent injunctive relief.

C.      **Claim under Washington Uniform Trade Secrets Act, RCW 19.108**

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

The Washington Uniform Trade Secrets Act ("WUTSA") is located at chapter 108 of title 19 of the Revised Code of Washington. WUTSA is largely identical to the Uniform Trade Secrets Act. Like the Uniform Trade Secret Act, WUTSA prohibits "misappropriation" of trade secrets and provides certain remedies.

Wash. Rev. Code § 19.108.010 defines the key terms of WUTSA. Pursuant to the WUTSA, "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.

Under the WUTSA, "Misappropriation" means:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was

(A) derived from or through a person who had utilized improper means to acquire it,

(B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or

(C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

In addition, under the WUTSA, "Person" means a natural person, corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity.

Finally, under the WUTSA, "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

In this case, the evidence will show that: (1) Defendants had access to HPT's trade secrets, including the HPT's source code, parameters' list, key generator, implementation of various algorithms, MPVI communication protocol documents and various HPT files, programs, documents, materials and information on a Flash Drive (which Sykes-Bonnett destroyed); (2) HPT's trade secrets are not generally known to, or readily ascertainable by, the general public or its competitors; (3) HPT's trade secrets have independent value, both actual and potential, from not being generally known, and not readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure and use; (4) HPT undertook significant efforts to maintain the confidential nature of its trade secrets; (5) Defendants misappropriated HPT's trade secrets without HPT's knowledge or consent; (6) Defendants' misappropriation of HPT's trade secrets was willful and malicious; (7) Defendants used, and may be continuing to use, HPT's trade secrets to benefit themselves/itself to the detriment of HPT; and (8) as a result of Defendants' misappropriation of trade secrets, HPT has suffered and will continue to suffer

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

damages.  Moreover, by virtue of the order in connection with Plaintiff's Motion for Sanctions for Spoliation of Evidence, Plaintiff is entitled to adverse inferences applicable to all Defendants concerning the evidence on the Flash Drive which was destroyed and jury instructions on this issue giving rise to liability for the claims asserted.  Thus, HPT will be entitled to a verdict in its favor on the claim for violation of the Washington Uniform Trade Secrets Act, RCW 19.108 in the form of damages and permanent injunctive relief.

### D.      Claim under Illinois Trade Secrets Act, 765 ILCS 1065/1 et. seq.

The Illinois Trade Secrets Act ("ITSA") is located at chapter 765 of the Illinois Compiled Statutes.  The ITSA is also largely identical to the Uniform Trade Secrets Act.  The ITSA prohibits "misappropriation" of trade secrets and provides certain remedies.

765 Ill. Comp. Stat. 1065/2 defines the key terms of ITSA.  Pursuant to the ITSA, "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means. Reverse engineering or independent development shall not be considered improper means.

Under the ITSA, "Misappropriation" means:

(1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of a person without express or implied consent by another person who:

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

(I) derived from or through a person who utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Under the ITSA, "Person" means a natural person, corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other for-profit or not-for-profit legal entity.

Finally, pursuant to the ITSA, "Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

Here, the evidence will show that: (1) Defendants had access to HPT's trade secrets, including the HPT's source code, parameters' list, key generator, implementation of various algorithms, MPVI communication protocol documents and various HPT files, programs, documents, materials and information on a Flash Drive (which Sykes-Bonnett destroyed); (2)

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

HPT's trade secrets are not generally known to, or readily ascertainable by, the general public or its competitors; (3) HPT's trade secrets have independent value, both actual and potential, from not being generally known, and not readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure and use; (4) HPT undertook significant efforts to maintain the confidential nature of its trade secrets; (5) Defendants misappropriated HPT's trade secrets without HPT's knowledge or consent; (6) Defendants' misappropriation of HPT's trade secrets was willful and malicious; (7) Defendants used, and may be continuing to use, HPT's trade secrets to benefit themselves/itself to the detriment of HPT; and (8) as a result of Defendants' misappropriation of trade secrets, HPT has suffered and will continue to suffer damages.  Moreover, by virtue of the order in connection with Plaintiff's Motion for Sanctions for Spoliation of Evidence, Plaintiff is entitled to adverse inferences applicable to all Defendants concerning the evidence on the Flash Drive which was destroyed and jury instructions on this issue giving rise to liability for the claims asserted.  Thus, HPT will be entitled to a verdict in its favor on the claim for violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 et. seq. in the form of damages and permanent injunctive relief.

### E.      Unfair Competition Claim under the Washington Consumer Protection Act, RCW 19.86.020

The elements to establish a claim under the Washington Consumer Protection Action are: (1) an unfair or deceptive act or practice; (2) in trade or commerce; (3) public interest; (4) injury to business or property; and (5) causation.  *See* Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 787–93, 719 P.2d 531 (1986).

The term "unfair or deceptive" is not otherwise defined in the Act. RCW 19.86.020. No intentional deception need be proved, only a capacity or tendency to deceive. *State v. A.N.W.*

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

*Seed Corp.*, 116 Wn.2d 39, 50, 802 P.2d 1353 (1991); *Hangman Ridge*, 105 Wn.2d at 785, 719 P.2d 531.

In this case, the evidence will show that Defendants used HPT's confidential and proprietary trade secret information, including but not limited to the VCM Suite Software, HPT's source code, HPT's communication protocol documents, HPT's implementation of algorithms, HPT's parameters list and various HPT files, programs, documents, materials and information from a Flash Drive in connection with the development of Defendants' products to compete with HPT.  Moreover, the evidence will show that Defendants publicly advertised and sold discounted HPT application keys (e.g. credits) to third parties without authorization.  Defendants' conduct deceived the public by passing off such application keys (e.g. credits) as authentic products and offerings of HPT when, in fact, they were not.  Plaintiff suffered damages by virtue of Defendants' misconduct.

**F.**       **Unfair Competition Claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et. seq.**

The Illinois Consumer Fraud and Deceptive Business Practices Act is designed to protect consumers, borrowers, and businessmen against business fraud, unfair methods of competition (unfair competition), and unfair or deceptive practices in the conduct of trade or business. *See* 815 ILCS 505/1, et seq.  Violations of the Act include the use of any deception, fraud, false pretense, false promise, misrepresentation, or concealment of facts in the conduct of trade or commerce. *See* 815 ILCS 505/2.

The elements of a private cause of action under the Illinois Consumer Fraud Act are:

(1) a deceptive act or practice by the defendant;

(2) the defendant intended the plaintiff to rely on the deception;

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

(3) the deception occurred in the course of conduct involving trade or commerce; and

(4) actual damages to the plaintiff proximately caused by the deception.

*See* 815 ILCS 505/1, et seq.

Here, the evidence will show that Defendants used HPT's confidential and proprietary trade secret information, including but not limited to the VCM Suite Software, HPT's source code, HPT's communication protocol documents, HPT's implementation of algorithms, HPT's parameters list and various HPT files, programs, documents, materials and information from a Flash Drive in connection with the development of Defendants' products to compete with HPT. Moreover, the evidence will show that Defendants publicly advertised and sold discounted HPT application keys (e.g. credits) to third parties without authorization.   Defendants' conduct deceived the public by passing off such application keys (e.g. credits) as authentic products and offerings of HPT when, in fact, they were not.   Plaintiff suffered damages by virtue of Defendants' misconduct.

### G.    Claim for Breach of Contract

Parties to a valid binding contract are legally obligated to abide by the terms of that contract.  *General Teamsters Local No. 231 v. Whatcom County*, 38 Wn. App. 715, 721 (Wash. App. 1984) ("It is hornbook law that a signed contract is binding on the parties as to all matters agreed upon in the contract."); *see also GMAC v. Everett Chevrolet, Inc*., 179 Wn. App. 126, 147 (Wash. App. 2014) ("Courts carefully protect the principle of freedom to contract and establish the terms of the contract."); Wash. Const. Art. 1, § 23 (no law impairing the obligation of contracts shall be passed).

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

A breach of contract is actionable where there is 1) a contract which imposes a duty; 2) the duty is breached; and 3) the breach proximately causes damage to the plaintiff. *Northwest Mfrs. V. Dep't of Labor*, 78 Wn. App. 707, 717 (Wash. App. 1995).

"A contract exists when the intention of the parties is plain and the terms of a contract are agreed upon . . . A contract requires offer, acceptance, and consideration." *Veith v. Xterra Wetsuits, LLC*, 144 Wn. App. 362, 366 (2008), *citing Christiano v. Spokane County Health Dist.*, 93 Wn. App. 90, 95 (1998). "There is no valid contract until an offer is accepted." *Id.*, *citing Hansen v. Transworld Wireless TV-Spokane, Inc.*, 111 Wn. App. 361, 370 (2002). "Acceptance is an expression (communicated by word, sign, or writing to the person making the offer) of the intention to be bound by the offer's terms." *Id.*, *citing Plouse v. Bud Clary of Yakima, Inc.*, 128 Wn. App. 644, 648 (2005). "A valid contract requires the parties to objectively manifest their mutual assent to all material terms of the agreement." *P.E. Sys., LLC v. CPI Corp.*, 176 Wn. 2d 198, 209 (2012).

In order to prevail on a breach of contract claim, the plaintiff must prove causation, the third element of a breach of contract claim. Under Washington state law, proximate cause encompasses both cause in fact and legal cause. *Northwest Mfrs.*, 78 Wn. App. at 713. "A cause in fact is a cause but for which the claimed damages would not have occurred." *Id.* Proximate cause occurs where the damages "may fairly and reasonably be considered either arising naturally, *i.e.* according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in contemplation of both parties at the time they made the contract, as the probably result of the breach of it." *Gaglidari v. Denny's Rests., Inc.*, 117 Wn. 2d 426, 446 (1990).

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

Here, in connection with Defendants' use of HPT's software, Defendants entered into the EULA with HPT.  The evidence will show that the EULA is a valid and enforceable contract and HPT fully performed its obligations under the EULA.  The evidence will show that the EULA provided, in pertinent part:

> You may not create a derivative work, reverse engineer, decompile, or disassemble the SOFTWARE PRODUCT, except and only to the extent that such activity is expressly permitted by applicable law notwithstanding this limitation.

The EULA also limits the user's right to transfer the software.  Specifically, it states:

> You may physically transfer the SOFTWARE PRODUCT from one of your computers to another provided that the SOFTWARE PRODUCT is used on only one computer at a time. You may not distribute copies of the SOFTWARE PRODUCT or accompanying written materials to others. You may not transfer the SOFTWARE PRODUCT to anyone without the prior written consent of HP Tuners LLC.

Among other things, Defendants (including Sykes-Bonnett and Syked Tuning, by virtue of its principals and independent contractors) admit to reverse engineering, decompiling, disassembling and otherwise hacking HPT's software in violation of the terms and provisions of EULA.  Defendants also wrongfully transferred, shared and disseminated HPT's software publicly without authorization in violation of the EULA.  Defendants' misconduct constitutes material breaches of the EULA and HPT will be entitled to a verdict in its favor for breach of contract.

### H.  Claim for Tortious Interference with Prospective Contractual or Economic Relations

Tortious interference occurs when someone improperly induces or otherwise purposely causes a third person not to enter into or continue a business relation with another.  Restatement (Second) of Torts § 766B.

PLAINTIFF'S TRIAL BRIEF - page 31

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

There are five elements to a claim for tortious interference with a contractual relationship or business expectancy: (1) a valid contractual relationship or business expectancy; (2) the defendant's knowledge of that relationship; (3) the defendant's intentional interference with that relationship or expectancy that induces or causes a breach or termination of the relationship or expectancy; (4) that defendant interfered for an improper purpose or used improper means; and (5) resultant damage. *Leingang v. Pierce County Medical Bureau*, 131 Wn.2d 133, 157 (1997).

A reasonable business expectancy, under the first element, includes any business relationship that would be of pecuniary value. *Newton Ins. Agency & Brokerage v. Caledonian Ins. Group*, 114 Wn. App. 151, 158 (Wash. App. 2002). Washington state law "does not require the existence of an enforceable contract or the breach of one to support an action for tortious interference with a business relationship." *Commodore v. University Mechanical Contractor*, 120 Wn. 2d 120, 138 (1992).

In order to prove that interference was *intentional*, the actor must have desired to bring the interference about or knew that "the interference is certain or substantially certain to occur as a result of his action." *Newton*, 114 Wn. App. at 158, citing Restatement (Second) of Torts § 766B, cmt. d. The interference must also have been unjustified or improper. *McGowan*, 723 F. Supp. at 539, *citing Scymanski v. Dufault*, 80 Wash. 2d 77, 87 (1971); *Pleas v. Seattle*, 49 Wash. App. 825, 832-33 (1987). "Exercising in good faith one's legal interests is not improper interference." *Leinang*, 131 Wn. 2d at 157, *citing Schmerer v. Darcy*, 80 Wn. App. 599, 506 (1996).

Here, the evidence will show that: (1) HPT had a valid business relationship or expectancy with its customers; (2) Defendants had knowledge of HPT's business relationships or expectancies with its customers; (3) Defendants intentionally and maliciously interfered with

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

HPT's business relationships or expectancies by publicly distributing hacked HPT software and by selling and/or giving fraudulent application keys and/or credits to HPT's customers; (4) Defendants' improper conduct induced a breach or termination of HPT's business relationships and expectancies; (5) HPT has suffered damages as a result of Defendants' tortious conduct. Thus, HPT will be entitled to a verdict in its favor for tortious interference.

## V.   LAW AND CONTENTIONS REGARDING DAMAGES

The damages available in this case vary somewhat as between the different claims that are being asserted.  Some of the damages are common as among the various claims, but some are unique as to each particular claim.

### A.   Overview

Generally, on claims which Defendants have admitted liability or if the jury finds that the Plaintiff has established any of its claims against any or all the Defendants, the jury "must determine the Plaintiff's damages" to which the Plaintiff is entitled. Manual of Model Civil Jury Instructions ("CV") 5.1.  Plaintiff is entitled to "such damages as will reasonably compensate the Plaintiff for any injury you find was caused by the defendant." CV 5.1.  The award of damages must be based upon evidence and not upon speculation, guesswork or conjecture.  CV 5.1.

If any element of damage is of a continuing nature, the jury must decide how long it may continue.  CV 5.4.  Future damages must be reduced to their "present" value.  CV 5.4.

### B.   Damages for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §1030

Under Section 1030(g) of the CFAA, provides a civil remedy for a violation of the CFAA to any person who suffers "damage or loss" from a violation of the Act. Section 1030(e)(8)(A) defines "damage" as "any impairment to the integrity or availability of data, a program, a system

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

or information, that – causes loss aggregating at least $5,000 in value during any 1-year period to one or more individuals." Section 1030(g) in creating a private right of action provides for compensatory damages, injunctive and other equitable relief.  The subsection limits recoverable losses to "economic damages."  Moreover, under the CFAA, a successful plaintiff may recover loss resulting from consequential damages and lost revenues.

Here, Plaintiff's damages for Defendants' violation of the CFAA exceed $8,720,000.

### C.      Damages for Misappropriation of Trade Secrets

Upon a finding of misappropriation of trade secrets, the Defend Trade Secret Act also provides for damages in the form of actual loss, unjust enrichment or a reasonable royalty.  More specifically, the Defend Trade Secret Act states:

> In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may…award damages for actual loss caused by the misappropriation of the trade secret; and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of a liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret.

*See* U.S.C. 18 § 1836 (b) (3).

Similarly, upon the finding of misappropriation of trade secrets, the Illinois Trade Secret Act provides for damages in the form of actual loss or unjust enrichment.  More specifically, the Illinois Trade Secret Act states:

> Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. If neither damages nor unjust enrichment caused by the misappropriation are proved by a preponderance of the evidence, the court may award damages caused by misappropriation measured in terms of a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

PLAINTIFF'S TRIAL BRIEF - page 34

*See* Illinois Trade Secrets Act, 765 ILCS 1065/4.

Likewise, upon a finding of misappropriation of trade secrets, the Washington Uniform Trade Secret Act also provides for damages in the form of actual loss or unjust enrichment. More specifically, the Washington Uniform Trade Secret Act states:

> In addition to or in lieu of injunctive relief, a complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

*See* Washington Uniform Trade Secret Act, RCW 19.108.030.

Consequently, damages for misappropriation of trade secrets may include both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not considered in computing the actual loss.

If the jury finds that the acts of the Defendants were willful and malicious, the Court may add an award of exemplary damages in an amount up to two times the amount of actual damages. 18 U.S.C § 1836(3)(B). Willful and malicious means that the Defendants acted voluntarily and intentionally with knowledge that their actions would injure the Plaintiff or with reckless indifference as to whether their actions would injure Plaintiff. O'MALLEY & J. GRENIG, §§ 127:14-127:15, at 435-437.

Furthermore, in addition to monetary relief, injunctive relief is available under the statutory claims for trade secret misappropriation.

### D.   **Damages for Unfair Competition**

Under the both the Washington Consumer Protection Act, RCW 19.86.020 and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et. seq.*, a plaintiff may recover both compensatory and punitive damages. *See* RCW 19.86.090; 815 ILCS

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

505/10a.  Under the Washington Act, the Court may increase the award of damages up to three times the actual damages sustained.  *See* RCW 19.86.090.  Moreover, a successful plaintiff may also obtain an award for attorney's fees under the either the Washington Consumer Protection Act or the Illinois Consumer Fraud and Deceptive Business Practices Act.  *See* RCW 19.86.090; 815 ILCS 505/10a.

### E.   <u>Damages for Breach of Contract</u>

Under Washington State law, "a party injured by breach of a contract is entitled (1) to recovery of all damages that accrue naturally from the breach and (2) to be put into as good a pecuniary position as he would have had if the contract had been performed."  *Columbia Park Golf Course, Inc. v. City of Kennewick*, 248 P. 3d 1067, 1079 (3rd Div. 2011); *see also Bruns v. William M. & Wilhelmina Cofer Living Trust, No.* 41062-1, 2012 Wash. App. LEXIS 396, at *19-20 (2nd Div. App. Feb. 28, 2012), *citing Lincor Contractors, Ltd. v. Hyskell*, 39 Wn. App. 317, 320-21 (1984) ("The purpose of awarding damages for breach of contract is . . . to place the plaintiff, as nearly as possible, in the position he would be in had the contract been performed.").  As such, attorneys' fees may be awarded in connection with a breach of contract claim.  *See, e.g., Workland & Witherspoon, PLLC v. Evanston Ins. Co.*, No. 2:14-CV-403, 2016 U.S. Dist. LEXIS 42637, at *7-9 (E.D. Wash. March 30, 2016).

### F.   <u>Damages for Tortious Interference</u>

Pursuant to the Restatement (Second) of Torts § 774(A), "one who is liable to another for interference with a . . . prospective contractual relation is liable for damages for (a) the pecuniary loss of the benefits of the . . . prospective relation; (b) the consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation if they are reasonably to be expected to result from the interference."  Restatement (Second) of Torts §

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

774(A); *see also Id.*, comment b ("Whether the interference is with an existing contract or with a prospective contractual relation, one who becomes liable for it is liable for damages for the pecuniary loss of the benefits of the contract or the relation . . . And when the defendant's interference is with prospective contractual relations, the plaintiff may recover for the loss of profits to be made out of the expected contracts.").

Washington State courts have adopted the Restatement in determining damages for intentional interference with prospective economic relations. *See, e.g., Pleas v. Seattle*, 774 P. 2d 1158, 1166 (Wash. Sup. Ct. 1989) (upholding award for pecuniary and consequential damages, as well as attorneys' fees, for those losses proximately caused by defendant's actions and where defendant was not otherwise immune); *see also Newton Ins. Agency*, 114 Wn. App. at 162 (in claim for tortious interference with prospective economic advantage, upholding damages award for lost income).

## VI.   COSTS AND ATTORNEYS' FEES

Litigation expenses fall into two general categories: (1) those that are taxable as "costs" pursuant to 28 U.S.C. § 1920; and (2) those that are "non-taxable," but are "related to" attorney fees. Fed. R. Civ. P. 54(d). Pursuant to Fed. R. Civ. P 54(d)(1) and 28 U.S.C. § 1920, the prevailing party is entitled to costs, consisting of (1) fees of the clerk and marshal; (2) fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) docket fees under 28 U.S.C. § 1923; and (6) compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under 28 U.S.C. § 1828.

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

The Ninth Circuit has found "out of pocket" expenses that would normally be charged to a fee-paying client are compensable.  *See Grove v. Wells Fargo Fin. California, Inc.*, 606 F.3d 577, 580-81 (9th Cir. 2010).  Reasonable out-of-pocket litigation expenses include the costs of postage, photocopying, travel, lodging, filing fees, deposition expenses, legal research charges, copying, meals and messenger service.  *See Id.*; *see also. Harris v. Marhoefer*, 24 F.3d 16, 19-20 (9th Cir. 1994).  They also include such expenses as fees paid to jury and trial consultants.  *See Carter v. Chicago Police Officers,* 1996 WL 446756, at *4 (N.D. Ill. Aug. 1, 1996).

Subject to "review" by the court, the "clerk may tax costs on 14 days' notice." Fed. R. Civ. P. 54(d)(1). A bill of costs "must be filed with the Clerk within twenty-one (21) days from entry of judgment." LCR 54(d).  Once Plaintiff prevails on its claims at trial, Plaintiff will file an appropriate bill of costs pursuant to Rule 54(d)(1) and LCR 54.

Finally, attorneys' fees are available with respect to Plaintiff's statutory claims as follows:

    a.  For Count II (Defend Trade Secrets Act) pursuant to 18 U.S.C. §1836(b)(3)(D);

    b.  For Count III (Washington Uniform Trade Secrets Act) pursuant to RCW 19.108.040;

    c.  Count IV (Illinois Trade Secrets Act) pursuant to 765 ILCS 1065/5;

    d.  Count V (Washington Consumer Protection Act) pursuant to RCW 19.86.020;

    e.  Count VI (Illinois Consumer Fraud and Deceptive Business Practices Act) pursuant to 815 ILCS 505/10a.

As noted above, attorneys' fees are also recoverable under Washington law in connection with Plaintiff's claim for breach of contract and tortious interference.  Consequently, Plaintiff's reasonable attorneys' fees incurred in connection with this matter are recoverable herein.

PLAINTIFF'S TRIAL BRIEF - page 38

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

"A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2).  "Unless a statute or court rule provides otherwise," any such motion "must be filed no later than 14 days after entry of judgment." Fed. R. Civ. P. 54(d)(2)(B)(i). Here, the appropriate procedure for awarding fees under these statutory claims is for the prevailing party to file a post-trial motion pursuant to Rule 54(d).  In addition, Plaintiff is entitled to its attorneys' fees in accordance with the Court's order on Plaintiff's Motion for Sanctions for Spoliation of Evidence.

Consequently, if the jury finds in favor of Plaintiff on the statutory claims as set forth herein, Plaintiff will file a motion for attorneys' fees and costs pursuant to Rule 54 and LCR 54.

Dated this 8th day of October, 2019

Respectfully submitted,


*s/ Andrew P. Bleiman*
Attorneys for HP Tuners, LLC

Stephen G. Leatham, WSBA #15572
Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
PO Box 611
211 E. McLoughlin Boulevard
Vancouver, WA 98666-0611
Telephone:  (360) 750-7547
Fax:  (360) 750-7548
E-mail:  sgl@hpl-law.com

Andrew P. Bleiman (admitted *pro hac vice*)
Marks & Klein
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
(312) 206-5162
andrew@marksklein.com

*Attorneys for HP Tuners, LLC*

Heurlin, Potter, Jahn, Leatham & Holtmann, P.S.
211 E. McLoughlin Boulevard, Suite 100
PO Box 611
Vancouver, WA  98666-0611
(360) 750-7547

1

## <u>**CERTIFICATE OF SERVICE**</u>

2

     I hereby certify that on October 8, 2019, I caused the foregoing to be electronically with

3

the Clerk of Court using the **CM/ECF system** which will electronically send Notice to all

4

Counsel of Record.

5

6
                        MARKS & KLEIN

7
                        *s/ Andrew P. Bleiman*

8
                        Andrew P. Bleiman (admitted *pro hac vice*)
                        1363 Shermer Road, Suite 318

9
                        Northbrook, Illinois 60062
                        Telephone:  (312) 206-5162

10
                        E-mail:  andrew@marksklein.com

11
                        Attorney for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFF'S TRIAL BRIEF - page 40